MIDWEST ENGINEERING & CONSTRUC-
TION COMPANY, Inc., a Corporation, and
Patterson Steel Company, a Corporation,
Plaintiffs in Error,

v.

ELECTRIC REGULATOR CORPORATION,
a Corporation, Defendant in Error.

No. 40804.

Supreme Court of Oklahoma.

Sept. 12, 1967.

Carl G. Engling, Steele & Downey, by, George S. Downey, Tulsa, for plaintiff in error Patterson Steel Co.

Best, Sharp, Thomas & Glass, Jack M. Thomas, Joseph A. Sharp, Tulsa, for defendant in error.

BLACKBIRD, Justice:

This appeal involves a controversy growing out of the failure, and refusal, of plaintiffs in error, hereinafter referred to collectively as "defendants", or individually as "Midwest", a Tulsa corporation, and "Patterson", another Tulsa corporation, to pay for a number of the 611 Kilowatt Meters and Voltage Regulators Midwest had ordered from defendant in error, a Connecticut corporation, hereinafter referred to as "plaintiff", to enable Midwest to comply with a U. S. Government contract it had obtained through the U. S. Army Corps of Engineers with district headquarters at Tulsa.

When Midwest, after receiving some of the Meters and Regulators, refused to accept shipment of any more of them, and attempted to rescind its alleged contract with plaintiff, plaintiff sought, by the present action, to recover, as damages, on account of Midwest's alleged breach of said contract, the so-called "contract price" not only of the Meters and Regulators, it had shipped Midwest, and had not been paid for, but, in addition, such price of others of the 611 Meters and Regulators it had manufactured, and/or assembled, especially to furnish Midwest for its said Government contract. Plaintiff's asserted cause of action against Patterson was based on the theory that it had guaranteed that the Meters and Regulators would be paid for. The sum for

which plaintiff sought judgment was $9,-103.24, plus interest and costs of the action.

Midwest's U. S. Government contract is referred to, and identified by, the following letters and figures: "DA-11-184-ENG-16168". The written memorandum of plaintiff's alleged contract with Midwest is a "Purchase Order" numbered "758-77" and dated August 14, 1958, which Midwest mailed to, and which was received by, plaintiff at its Norwalk, Connecticut, headquarters on August 18, 1958. The material parts of the "Purchase Order" are as follows:

"Please Ship the Following Described Material:

\* \* \* \* \* \* \* \* \* \* \*

"Via Best Way    Terms    Net 30    F.O.B.    Norwalk

\* \* \* \* \* \* \* \* \* \* \*

| "QUANTITY | DESCRIPTION | PRICE QUOTED |
|---|---|---|
| 611 | Kilowatt Meter in accordance with MIL-M-10304 and purchase description dates October 25, 1957, for 30 KW Generators | 85.00 each |
| 611 | Voltage Regulator in accordance with purchase description dated October 25, 1967, for 30 KW Generators | 45 each |
| | Subject to source inspection DA-11-184-ENG-16168 | |
| | Certification Required. | |
| | Delivery Required: 1 each item Aug. 25, 1958 Balance: 25 each item per month Beginning September 20, 1958. | " |

The day it received the above quoted Purchase Order, plaintiff's sales manager, Mr. Walter, wrote Mr. R. E. Parker, Midwest's Director of Purchasing, the following letter:

"Many thanks for your Purchase Order calling for 611 Voltage Regulators and 611 Kilowattmeters.

"We respectfully request that the requirement for source inspection be deleted from your order as this procedure is most unusual for regulators. It has not been the practice of the Corps of Engineers' Inspection Group to ask for source inspection on regulators; they being in agreement that the end item must pass the specifications and any previous testing has no value to normal modifications of the product after shipment.

"If you see any difficulty in accomplishing this change, we would like to discuss this with you in order to avoid this extra procedure.

"Again, many thanks for the subject Purchase Order. We look forward to working with you on this subject."

Thereafter, in September, 1958, Patterson purchased the majority of stock in the Midwest corporation, and Mr. P. W. Patterson became Midwest's Vice-President, also. About the same time, plaintiff manufactured 2 prototypes, or "pilot models", of the above mentioned Voltage Regulators,

and simultaneously with its shipment of them, mailed to Midwest its invoice dated September 23, 1958. The body of the invoice was as follows:

| Your Order No. 758–77 | Our Order No. 13394 | Terms See reverse side |
|---|---|---|

| QUANTITY | DESCRIPTION | PRICE AMOUNT |
|---|---|---|
| 611 | 611 Voltage Regulators, Part 13461 consisting of: REGOHMS, Type 3WCD115, part 13461–1 Size 3 Chassis, part 13461–2 (Moisture & Fungus proof), with voltage adjusting rheostats | $24.50 ea. net $20.50 ea. net |
|  | DELIVERY: 2 pilot models Sept. 23, 1958. Balance held for receipt of your approval. Production can start approximately four weeks from receipt of written approval of pilot models. |  |

FOB Norwalk, Conn.

We do not recognize terms and conditions printed on the purchase order which enlarge the liability or responsibility of the Seller as set out in this acceptance."

───────◆───────

According to a statement of Midwest's account, which was introduced in evidence as defendant's Exhibit No. 2, the above mentioned pilot models were paid for (on the basis of their contract price, in the total amount of $91.64) by a remittance Midwest forwarded to plaintiff, and plaintiff credited to the account, on October 14, 1958.

Under date of November 24, 1958, Mr. P. W. Patterson's brother, Mr. N. R. Patterson, who was the Patterson Company's President, wrote a letter, on behalf of Patterson that was received by plaintiff on November 28th, and read, in part, as follows:

"Pursuant to 'phone conversation of this morning with Mr. W. H. Walters of your sales department, we are writing this letter to state that we are guaranteeing payment of the account of the Midwest Engineering & Construction Company, Inc., invoices to be paid according to our established paying policy.

"Midwest has issued their purchase order No. 758–77 covering 611 units of Voltage Regulators to be used on government contract No. DA–11–184–ENG–16168. With the above information we trust you will approve the credit of Midwest and make shipments promptly as required.

"*      *      *      *      *      *"

Thereafter, on December 2, 1958, Midwest wired plaintiff:

"Ship 25 regulators for our # 30KW generator sets. Accept this as a receipt of authorization."

Defendants' above mentioned Exhibit No. 2 indicates this quoted telegraphic request to plaintiff, to ship more of the 611 regulators prescribed in the August Purchase Order, was complied with, and charges therefor were entered on Midwest's account, in January, 1959. The same exhibit indicates that plaintiff shortly thereafter shipped to Midwest others of the Purchase Order's prescribed articles, for which a debit of $1125.00 was entered on Midwest's account February 17, 1959.

After plaintiff had received no remittance for its 1959 shipments to Midwest,

and apparently the latter had ignored plaintiff's communications concerning the unpaid balance of its account therefor, plaintiff wrote Patterson a letter, dated March 30, 1959, calling its attention to the delinquency in Midwest's account—whose unpaid balance then totaled $2299.70 (itemized in the letter by invoice number and date)—and continuing as follows:

"We have already written several letters to Midwest Engineering & Construction without the courtesy of a reply.

"In accordance with your letter dated November 24, 1958, guaranteeing payment of the account, we are requesting from you payment of the above past due invoices."

Thereafter, despite plaintiff's already announced refusal to ship Midwest any more regulators, or kilowatt meters, until the past due account was paid, Midwest's R. E. Parker wired plaintiff on April 15, 1959, to ship 15 more of the regulators on April 24. After plaintiff had wired back, refusing to do this, and had written Midwest at least three letters seeking payment of the past due account, plaintiff, on May 15, 1959, received the following letter, dated May 11, from Midwest:

"This letter is a supplement to and a part of our P. O. No. 758–77.

"Until notified no further action is to be taken on our above order due to this contract is being held in abeyance for rescheduling and possible quantity change."

Thereafter, plaintiff, on June 1, 1959, received from Midwest the following notation, written on one of its Purchase Order forms dated May 26th:

"Reference our P. O. 758–77 and cancel in its entirety."

The next day, June 2, 1959, plaintiff entered debits on Midwest's account in the amounts of $6,676.50, and $127.04, respectively, which represented the contract price of regulators and meters it had manufactured on the strength of Midwest's 1958 Purchase Order, so as to be able to ship them when Midwest directed and/or pursuant to the shipping schedule indicated in that Purchase Order. With these additional charges added to Midwest's account, its unpaid balance totaled the sum, for whose recovery plaintiff, after further attempts to collect it proved futile, instituted the present action in November, 1963.

As one defense to plaintiff's action, the defendants introduced evidence at the trial, apparently contemplated to make it appear that it was established, by a test conducted at Midwest's Tulsa establishment, on March 10, 1959—under the observation of Mr. Ralph Matthews, an electrical engineer then employed by, and representing, the Army Corps of Engineers—that the voltage regulators furnished Midwest by plaintiff would not function properly, and/or meet the test specifications prescribed in Midwest's Government contract DA–11–184–ENG–16168, supra, and referred to in the Purchase Order involved in the present action. Matthews testified, however, in substance, that as far as he knew, plaintiff was not apprised of the results of this test; and there was no other evidence introduced to indicate that plaintiff ever had any notice, or inkling, of any claimed defects in the regulators it furnished Midwest, at least not until after it had fabricated many of the number (611) prescribed in the Purchase Order, and had charged them to Midwest's account. To the contrary effect, plaintiff's sales manager, Mr. Powers, testified that he had no knowledge as to whether the regulators (when Midwest assembled and operated them, with the generators) "functioned properly within the contract requirements."

At the close of plaintiff's evidence, the defendant Patterson demurred to it, and, after the court's adverse ruling thereon, defendants introduced evidence on their own behalf. At the close of all of the evidence, defendant Patterson challenged its sufficiency by a motion for a directed verdict. When this motion was overruled, the court gave the jury certain instructions, some of which were objected to by the defendants; and refused defendants' request-

ed instruction No. 2, which, if followed by the jury, would have eliminated consideration, in its assessment of plaintiff's damages, of the contract price of the regulators and kilowatt meters plaintiff fabricated for, but never delivered to, Midwest.

After first leaving the court room to begin its deliberations, the jury returned, and, through its foreman, propounded certain questions to the trial judge. The material part of one of these questions was as follows:

"*    *    *    *    *    *

"* * * we were wondering, is the plaintiff—in the case of a verdict in favor of the plaintiff, are they guaranteed payment from the one company if the other company is not also named?"

The judge's answer to this question, and the proceedings following it, as shown by the case made, were as follows:

"THE COURT: I don't know that I can make that any plainer that you could understand it. The Patterson Steel Company is a guarantor of payment here under certain circumstances that has been brought to you before—that has been brought before the Jury here by the testimony of witnesses; and then, furthermore, the Patterson Steel Company, I believe, took over, according to the evidence here, the other company. Now, therefore, you have three possible verdicts under the instructions that you may give, and you hold them now in your hands, those possible verdicts, is about all I can say that I know of here to make it any plainer.

"THE FOREMAN: The question arose, and we wanted to see if there was —possibly we didn't understand you. Thank you.

"THE COURT: Yes, sir. All right, you may return to the jury room.

"(The jury having returned to the jury room for further deliberations, the following proceedings were had:)

"MR. DOWNEY: Comes now the defendant Patterson Steel Company and objects to the statements of the Court made in response to questions asked by one who was apparently the foreman of the jury, for the reason that in the Court's statement was contained an assumption that Patterson Steel Company had entered into a guaranty contract, which conclusion, if to be drawn, invaded the province of the jury and was prejudicial to the rights of the defendant Patterson Steel Company."

At the close of the jury's deliberations, it returned a joint verdict, for the full amount plaintiff sought, against both defendants; and judgment was thereafter rendered accordingly. After the overruling of defendants' separate motions for a new trial, they perfected the present appeal.

For reversal, defendants urge eight propositions. Under its propositions "II" and "V", both inclusive, defendants challenge the sufficiency of the evidence to support the liability established by the verdict and judgment on the alleged contract between plaintiff and Midwest; while, under three of their other propositions, defendants challenge only the liability of Patterson on the guaranty of Midwest's payment, described in Patterson's hereinbefore quoted letter of November 24, 1958. In dealing with the arguments under the first group of propositions, we will assume, without deciding, that the motion for a directed verdict interposed solely by the defendant Patterson, laid a sufficient predicate for raising the questions dealt with in those arguments.

Defendants' argument under their Propositions "III'" and "IV" have reference to the facts that Purchase Order No. 758–77, supra, bore the notation (hereinbefore depicted): "Subject to source inspection"; that plaintiff's letter to Midwest, following receipt of said Purchase Order, requested that "the requirement for source inspection be deleted from this order * * *"; and that no such inspection of the meters and regulators plaintiff furnished Midwest, ever occurred.

It seems to be defendants' essential position under Proposition III that, when plaintiff requested deletion, or elimination, of this "source inspection" condition of the offer to purchase, evidenced by Midwest's said Purchase Order, said request constituted a "counter offer", which was never shown to have been accepted, or agreed to, by Midwest; and that therefore there was no valid and binding, or enforceable, contract between the parties. Plaintiff, on the other hand, takes the position that even though it never received any letter, or communication, from Midwest specifically acceding to its request that source inspection be abolished, or waived, as a condition of Midwest's purchase, yet the fact that plaintiff shipped, and Midwest received, and paid for, some of the articles described in the Purchase Order, relieved the parties' alleged agreement from any infirmity that might otherwise have rendered it unenforceable as a contract.

▅▅▅ In Lee v. National Refining Co., 181 Okl. 556, 557, 75 P.2d 406, 408, this court recognized the principle defendants rely on, but it also recognized, in connection therewith, a rule which we think applies to this case, by quoting Kingfisher Mill & Elevator Co. v. Westbrook, 79 Okl. 188, 192 P. 209, as follows:

"Where a person offers to do a definite thing, and the party to whom the offer is made accepts conditionally, or introduces a new and material term into the acceptance, his answer constitutes a counter proposal, and there is no agreement; *but, when the party to whom the counter proposal is made accepts it, such counter proposal and acceptance constitute a binding contract.*" (Emphasis added).

See also Cole-McIntyre-Norfleet Co. v. Holloway, 141 Tenn. 679, 214 S.W. 817, 7 A.L.R. 1683. It is our opinion in this case that when Midwest, after receiving plaintiff's letter of August 18, 1958, requesting that source inspection of the meters and voltage regulators referred to in its Purchase Order No. 758–77, supra, be dispensed with, did not reply to said letter, but there-

after accepted delivery of the two pilot models plaintiff shipped to it, as evidenced by the invoice dated September 23, 1958, and paid plaintiff for them the next month (October), and thereafter repeatedly accepted other such articles shipped to it under said Purchase Order, pursuant to its telegraphic shipping requests, without indicating any objection to plaintiff's request for deletion of source inspection, Midwest, engaged in conduct, from which the jury was warranted in concluding that it impliedly acceded to said request, and that it entered into a binding contract to purchase the articles specified in the purchase order, without their being "source" inspected. In this connection, and as to related matters, see C. H. Lowenthal Co. v. McCormack Bros. Co., 144 Wash. 229, 257 P. 632, Wood & B. Co. v. Hewitt Lumber Co., 89 W.Va. 254, 109 S.E. 242, 19 A.L.R. 467, and the annotation following it; 46 Am.Jur., "Sales" § 47, note 10, and § 48, note 4, with the annotations there cited, and others at 26 A.L.R.2d 1139, 1149 ff., and 77 C.J.S. Sales § 25 a, p. 633. If Midwest had not intended that the source inspection be eliminated from the parties' agreement, it was encumbent upon it to so notify plaintiff, especially in view of the statement in plaintiff's letter: "*If* you see any difficulty in accomplishing this change, we would like to discuss this with you in order to avoid this extra procedure." In this connection, see C. R. Anthony Co., Inc. v. Stroud, 189 Okl. 104, 105, 114 P.2d 177, 178, where this court said: "If neither of the propositions submitted by plaintiff was acceptable, it was its duty to negotiate with plaintiff for terms." Without any word from Midwest as to this requested modification of the parties' agreement, plaintiff was justified in assuming, in view of Midwest's conduct, that its silence, as to the modification, indicated its consent thereto. In this connection, see Am.Jur., supra, § 50, note 2, and § 51, notes 9 and 18.

Consistent with our conclusion that plaintiff and Midwest entered into a binding contract that did not contemplate source inspection, we have also concluded that

there is no merit to defendants' argument under their Proposition IV, that, without proving that the meters and regulators had been so inspected, plaintiff "failed to establish essential conditions precedent to its cause of action." In our opinion, if source inspection of the meters and regulators was ever a part of any agreement between plaintiff and Midwest, Midwest could quite correctly have been found to have waived this requirement under the facts of this case. In this connection, see Henry H. Cross Co. v. Texhoma Oil & Refining Co. (C.C.A.8th Cir.) 32 F.2d 442. It therefore follows that proof of compliance with such a requirement, or condition, was not necessary to plaintiff's recovery, and the absence of such proof was no proper obstacle to the trial court's submission of the case to the jury, and to his rendition of judgment in accord with that body's verdict in favor of plaintiff.

▆▆▆ Under their Proposition V, defendants contend that another reason the evidence was insufficient to go to the jury, and to support plaintiff's recovery, is that it did not establish plaintiff's delivery or offer to deliver, or that it was ready, willing, and able to deliver all of the 611 meters and voltage regulators specified in Midwest's Purchase Order No. 758–77. We have already indicated that there is no merit to defendants' further contention that plaintiff never unqualifiedly accepted the terms and conditions of said Purchase Order, by deciding that the evidence was sufficient to support a conclusion that Midwest accepted plaintiff's "qualification" of it, by thereafter repeatedly requesting shipments under it, without mention of, or objection to, plaintiff's request that the Purchase Order's specification of source inspection be dispensed with. It is necessary only to recall Midwest's written direction, that plaintiff received June 1, 1959, to cancel the Purchase Order "in its entirety", in order to contradict defendants' answer brief's further representation that plaintiff "failed to prove repudiation of his alleged contract by Midwest." Plain-

tiff suggests that if it had continued to ship more meters and regulators after Midwest had, for more than three months in early 1959, ignored its debt to plaintiff for meters and regulators previously shipped, the guarantor Patterson would have been released from its guaranty of Midwest's account. Haynes v. Brown, 18 Okl. 389, 89 P. 1124, and Waggoner Refining Co. v. Bell Oil & Gas Co., 117 Okl. 55, 244 P. 756, do not support defendants' position, because they both show that there are exceptions to the rule requiring a party, suing another for breach of contract, to show that he has tended performance on his part; and that a valid excuse for not making such a tender is the other party's repudiation of the contract, or demonstration that he does not intend to abide by it. In Bushey v. Dale, 181 Okl. 481, 75 P.2d 193, we held:

> "In establishing a default in the performance by one party of his obligations under an executory, bilateral contract, it is unnecessary to prove a tender of performance by the other party to said contract, if the former has absolutely refused to perform his own said contractual duties."

See also Bu-Vi-Bar Petroleum Corp. v. Krow (C.C.A., 10th Cir.) 40 F.2d 488, 69 A.L.R. 1295, and 17 Am.Jur.2d, "Contracts", §§ 358, 428, 429, 449 and 17A C.J.S. Contracts § 481. Under the undisputed facts of the present case, we hold that plaintiff was under no obligation to tender delivery to Midwest of all of the meters and voltage regulators prescribed in Purchase Order No. 758–77, before instituting the present action for damages on account of Midwest's breach of the contract between them. It therefore follows that the failure of the evidence to establish such a tender constituted no ground for a directed verdict, or for a judgment in defendants' favor.

▆▆▆ Under their Proposition II, defendants contend that the trial court erred in refusing to give its requested instruction No. 2, which would have precluded the jury from awarding plaintiff the contract price of the meters and voltage regulators

that it had delivered to Midwest, but had not been paid for, as well as others it had fabricated and/or assembled to await shipping requests from Midwest, when, on June 1, 1959, it received Midwest's communication to cancel Purchase Order No. 758–77. According to defendants' written request for said instruction, it was based upon Outcault Advertising Co. v. Mack (Mo.App.) 259 S.W. 511; and defendants' brief cites O'Dell v. Nelson & Meyers, 182 Okl. 563, 79 P.2d 212, as additional support for their contention that the trial court erred in allowing the jury to base its assessment of damages on the meters' and regulators' contract price. Neither of the cited cases supports this contention of error. Both involved materials that had a value for purposes other than carrying out the particular contracts, or agreements, involved, such as market value, or value for fulfilling other contracts of the vendors. In the present case, the undisputed testimony of Mr. Wallace Powers, sales manager of the plaintiff corporation, was to the effect that the articles here involved were made up especially for Midwest's order, and were unsuitable, and had no value, for purposes other than filling that order. In such a situation, it is our opinion that the appropriate measure of damages was the contract price of the articles. See 46 Am.Jur., "Sales", § 626, at note 11, and cases discussed in the annotations at 44 A.L.R. 215, 268–270, both inclusive. We therefore hold that the trial court committed no error in refusing to give defendants' requested instruction No. 2.

Defendants' Proposition VI is as follows:

"No recovery may be had upon an alleged guarantee of payment of an account in the absence of a new and separate consideration where such guarantee comes into existence after the original undertaking; no guarantee may be relied upon unless it moves the party guaranteed to perform some act which such party was not already legally obligated to perform, to such party's detriment."

Pursuant to defendants' argument under this proposition, it is observed that, as far as the record shows (defendants' Exhibit No. 2, supra) plaintiff furnished nothing to Midwest under Purchase Order No. 758–77, after it charged Midwest's account for the initial pilot models on September 23, 1958 (which were paid for as evidenced by a credit entered on the account October 14, 1958) until January 12, 1959 (as indicated on the next debit of Midwest's account) so that, on November 24, 1958—the date of Patterson's guaranty letter—Midwest's account had no debit balance, and, as defendants stated, it stood at "zero zero."

■ Defendants' argument is to the effect that since there was no money owed plaintiff by Midwest at the time this letter was written and received, and the evidence does not show that the purported guarantee of payment of Midwest's account therein expressed ("invoices to be paid according to our established paying policy") was any different from the "net 30" typed on the Purchase Order when plaintiff received it, the evidence failed to show that the letter, relied upon as a contract of guaranty, called for plaintiff to give any benefit, or suffer any detriment, than that which it was already obligated to do, under the antecedent contract between plaintiff and Midwest, evidenced by the Purchase Order of August 18, 1958, whose execution, or performance, had already commenced. Defendants argue that, consequently, the evidence did not show sufficient consideration for Patterson's letter, to make it binding as a contract of guaranty, citing and quoting Tit. 15 O.S.1961, § 106, Clements v. Jackson County Oil & Gas Co., 61 Okl. 247, 161 P. 216, L.R.A.1917C, 437 and Eastman Land & Investment Co. v. Long-Bell Lbr. Co., 30 Okl. 555, 120 P. 276.

Plaintiff, on the other hand, contends that the written letter of guaranty was in itself presumptive evidence of a consideration therefor, and that the burden of proving its "want of consideration" (if that was a fact) was upon the defendants, citing Tit. 15 O.S.1961, §§ 114, 115, and

Miller v. Oil Well Supply Co., 79 Okl. 135, 191 P. 1094. Defendants' only attempt at directly refuting this argument is the following portion of its reply brief:

"* * * This * * * is a flight into legal theory for the reason that the record shows no written contract, but an offer of guaranty by Patterson Steel based upon several conditions precedent, none of which plaintiff performed, nor did it ever accept the offer of guaranty which in itself makes the offer ineffective. Consequently, there was admittedly no 'contract' of guaranty *to which a presumption of consideration could apply*." (Emphasis added).

In view of the quoted argument, we take it as tacitly conceded that the letter of guaranty was such an "instrument" as contemplated in §§ 114 and 115, supra, unless it was a mere *offer* of guaranty and lacked the attributes of a *contract* of guaranty, as contended by defendants. A discussion of these attributes involves dealing with Defendants' arguments under their Proposition VII. Therefore, we move on to those arguments, leaving the answer to defendants' arguments concerning consideration for the letter under both their Propositions VI and VII, to rest upon their failure to discharge their burden of proof, and the "presumptive evidence" statute (§ 114, supra) mentioning only that the record tends to support the presumption, or inference, of a new and additional consideration for Patterson's guaranty letter of November, 1958, by indicating that, after receiving it, plaintiff extended credit to Midwest longer than 30 days, and complied in February, 1959, with a shipping request from Midwest, without having been paid, or demanded payment, for other contract articles it had previously shipped Midwest early in January—more than 30 days before. If, as a result of, and in consideration for, Patterson's letter of guaranty, plaintiff waived, or enlarged, as to 1959, and subsequent shipments, the Purchase Order's requirement of payment within 30 days, then this constituted a new and

distinct consideration not originally prescribed in plaintiff's contract with Midwest, and this case is distinguishable from those cited by defendants, wherein, under the claimed contracts of guaranty there involved, the guarantee was obligated to do no more than, under its previous contract, it was already obligated to do. As at the time it issued the letter, Patterson was a major stockholder in Midwest, it "had what it deemed to be good reason to expect a substantial benefit from the making of the guaranty." Woods Lumber Co. v. Moore, 183 Cal. 497, 191 P. 905, 908, 11 A.L.R. 549, 553. As to this and related matters, notice other cases cited in the footnotes to 24 Am.Jur., "Guaranty", § 51, and 38 C.J.S. Guaranty § 26 b, c, d.

Under their Proposition VII, defendants contend, in substance, that Patterson's letter of November 24, 1958, could have been no more than an *offer* of guaranty, because of the claimed absence of any evidence that plaintiff's acceptance of it was ever communicated back to Patterson, or any showing that it constituted "an 'absolute guarantee' under Oklahoma law", citing Tit. 15 O.S.1961, §§ 326 and 331. Defendants' initial brief says that plaintiff's witness "Powers admitted and the record shows that there was little, if any reliance" by plaintiff "on the Patterson letter as a 'guarantee'; * * *". Powers' testimony comprises approximately 135 pages of the case made. Although defendants do not cite the page or pages, of this record supporting their representation as to this witness' so-called "admission", we have examined all of his testimony, and did not discover it. On the contrary, we have found, from our examination of the entire record, evidence which tended to show that plaintiff did rely on the letter of guaranty; and the evidence indicates no other explanation for plaintiff's shipment to Midwest of February 17, 1959, despite a debit balance, more than 30 days old, in Midwest's account, and for plaintiff's hereinbefore quoted letter to Patterson dated March 30, 1959.

As to defendants' contention that no contract of guaranty was ever established by the evidence, because it failed to show plaintiff ever communicated to Patterson its acceptance of the guaranty offer contained in the November, 1958 letter, it is our opinion that under the facts of this case, no such proof was necessary. Mr. N. B. Patterson's reference, in the letter to a previous " 'phone conversation' " with Mr. Walters of plaintiff's sales department—when considered with certain parts of Mr. Powers' testimony—tends to show that the letter was merely a formal confirmation, and memorandum in writing, of an agreement already reached verbally between representatives of plaintiff and Midwest, and that such an agreement was sought, requested, or solicited by plaintiff, after it learned that the Patterson Company had become involved, and financially interested, in the operation of the Midwest Company. Because of the Patterson Company's ownership of Midwest stock and the key position its officer, N. R. Patterson, held in Midwest, we think the jury was warranted, under the authorities on the matter, in concluding that the Patterson Company knew, or should have known, that plaintiff accepted the guaranty offer, without the necessity of dispatching a letter to that effect. In this connection, see Miller v. Oil Well Supply Co., supra; McGowan v. Wells' Trustee, 184 Ky. 772, 213 S.W. 573, and other cases cited and discussed in the annotation at 6 A.L.R.2d 355, 396–407, 415, 418 and the footnotes to 24 Am.Jur., supra, § 102.

Under Defendants' Propositions I and VIII they complain of a single verdict having been returned, and a single judgment having been entered against both. Their argument, as we understand it, seems to be that it was error to allow recovery against both defendants jointly, because plaintiff's alleged causes of action, if any, against them were different—one being based upon a purchase contract, and the other on a guaranty contract. It seems to be their position, under Proposition VIII, that the contract of guaranty, if any, was not intended to apply to damages resulting to plaintiff from a breach of the purchase contract evidenced by Purchase Order No. 758–77, but was intended to guarantee only Midwest's payment for meters and regulators actually furnished or shipped to it. This argument seems to be an after thought, and an attempt to inject an issue into this appeal not joined at the trial of the case. In argument under their Proposition I, defendants quote the allegations in plaintiff's petition to the effect that Patterson's guaranty was a "guarantee of the purchase order." In Patterson's answer, it made no claim that a recovery of the damages plaintiff sought against Midwest, would not entitle plaintiff to a judgment against it in an identical amount; nor, did the defendants, or either of them, object to the trial court's instructions No. 7 and No. 17, both of which told the jurors, in substance, that if they found Midwest had breached its contract with plaintiff, they should return a verdict against both defendants for the damages they found plaintiff had suffered by reason of said breach. It is a long established rule of appellate review in this jurisdiction that parties are bound in this court by the theories on which they try their cases in the lower court, and cannot secure reversal here on an error they have invited there, or by assuming a position here, inconsistent with that taken there. See Chrysler Corp. v. Walter E. Allen, Inc., (Okl.) 375 P.2d 878, Cimarron Valley Pipe Line Co. v. Holmes, 182 Okl. 450, 78 P.2d 403, and numerous other cases digested in 2A Okl. Dig., Appeal and Error, ☞882(3). We have thoroughly examined the entire record of the trial out of which this appeal arose, and, on the basis thereof, it is our opinion that neither of the defendants can now be heard to complain of the entry of the joint verdict and judgment against them.

As we have found in none of the arguments presented by the defendants a suf-

ficient and effective ground for reversing the judgment of the trial court, said judgment is hereby affirmed.

All the Justices concur.