**HOME–STAKE PRODUCTION COMPANY, a Corporation, Plaintiff in Error,**

v.

**R. E. MINNIS, Jr., and O. H. Hill, Defendants in Error.**

**No. 41955.**

Supreme Court of Oklahoma.

April 23, 1968.

Rehearing Denied June 25, 1968.

Thomas A. Landrith, Jr., Tulsa, for plaintiff in error.

Paul Brown, of Brown, Verity & Brown, Oklahoma City, for defendants in error.

BLACKBIRD, Justice.

The action involved in this appeal was based upon a contract pertaining to the development of certain oil properties in the Seminole Field. This Field was the result of the discovery, in the early part of the decade, between 1920 and 1930, that the Wilcox Sand, which lies at a depth of approximating four thousand feet in much of Seminole County, was a prolific producer of oil. Much of the field's initial, or primary, development and production occurred prior to the enactment of most of this State's present oil and gas conservation laws, and many of its original producing leases have, in the past 20 years, quit

producing and have been abandoned with little, if any, use of the more modern methods and sophisticated techniques which, in later years, have come into common use in drilling and completing oil and gas wells, and developing oil and gas leases. In more recent years, it has been determined that much oil, left in place under those leases when their wells quit pumping, can be recovered by present-day methods; and several lessees have been successful in what has been termed "secondary recovery" or "secondary development" programs.

During a period of some months before the year 1963, plaintiff in error, hereinafter referred to as "defendant", became interested in launching its own secondary recovery program in Seminole County and was considering the purchase, for that purpose, of leases held by Petroleum Consultants Inc., hereinafter referred to as "PCI". Accordingly, its President, Mr. Trippett, enlisted the aid of two consulting geologists who appear here as defendants in error (and will hereinafter be referred to by name or as "plaintiffs") in this program. The terms and conditions under which plaintiffs would assist defendant were set out in a letter dated January 17, 1963, drafted and signed by Trippett, (who had been a practicing lawyer) and accepted by plaintiffs, at a conference with him in defendant's Tulsa office. The letter, other than its formal parts, reads as follows:

"This will set forth our arrangement as follows:

"1. We are now looking at acreage owned by PCI in Seminole County, Oklahoma, where Bill Doenges has a ⅛ override after payout. PCI may want to sell this acreage. You will make a recommendation to us as to whether we should acquire the acreage. If you recommend that we not acquire it, then we will pay you $50 per day for the time you have spent in determining what your recommendation will be. If you recommend that we acquire it, we still may not acquire it because of the unfavorable lease situation, but if you recommend that we acquire it and you do any more work for us you will be paid $50 a day for such additional work.

"2. If we do acquire the acreage then you will do additional geological work, both in the office and in the field for us. The office work shall be at the rate of $50 per day and the field work shall be as follows: Up to 3 hours, $25.00; up to 6 hours, $50.00; up to 9 hours, $75.00; 9 to 24 hours, $100.00.

"3. *If you recommend that we acquire additional acreage surrounding the Doenges acreage and we do acquire it, you will be entitled to an overriding royalty interest of ⅟₁₆ of ⅞ on such additional acreage if we go ahead and acquire such other acreage without other overriding royalty interests. If we have to pay other overriding royalty interests to acquire the acreage, then such other overrides shall be deducted from your override, all to the end that the acreage shall not be burdened with a total override of more than ⅟₁₆ of ⅞.*

"4. It is understood that if we acquire the Doenges acreage we will guarantee you a niminum of $2,500 worth of work.

"5. We already own acreage at Cromwell and Searight in Seminole County, Oklahoma. We shall have the right to call on you for office and field work in connection with those projects. We will pay you $50 per day for office work and field work shall be paid for on the same schedule as set forth above.

"* * *

"7. It is also understood that *we want to acquire additional* projects in the Seminole area. *If you recommend them to us and we acquire them,* we will pay you $50 a day for office work you did leading up to the recommendation and acquisition. Furthermore, *you will get the same overriding royalty interest basis as outlined above on acquired acreage.* Further, after we acquire such projects, we will expect to call on you for addi-

tional field and office work and it will be at the same rates as set forth above.

"In doing office work you may have to order maps, logs, etc., and you shall be entitled to charges for your actual out-of-pocket expenses in that connection. In field work you shall be entitled to charges for your travel expenses in addition to the per diem rates set forth above." (Emphasis added.)

Thereafter, plaintiffs, after studies of areas lying in different directions from the PCI acreage, recommended defendant's purchase of leases in what came to be referred to as the "Susie", "Gold Creek", "Mission", and "Little River" projects. During the months of February, March and April, 1963, Seminole County lease and royalty brokers, Herman A. Bishop and W. J. Haning, assisted defendant in the acquisition of oil and gas leases with primary terms of two and three years, on almost 4,000 acres of Seminole County land for these 4 projects.

After a preliminary report concerning those leases earlier that month, plaintiffs addressed a written report, dated April 25, 1963, to Mr. Frank Sims, senior Vice-President of the defendant Company, recommending in rather specific detail, recompletion and testing procedures for a well known as the "A–1 Rascoe", on the Rascoe lease, and drilling procedures for another well to be known as the "O–2 McDonough" well on the McDonough lease, both of which leases were a planned part of the defendant's Susie project. Some of these procedures were not thereafter followed, due largely to differences of opinion, and perhaps a clash of personalities, between Mr. Carl Weatherford, defendant's petroleum engineer, and one or both of the plaintiffs. Plaintiffs complained of this in a long distance call to Mr. Trippett, who was then in New York, early in June; and then, after Trippett returned to Tulsa, they addressed a letter to him dated June 12, 1963, on the same subject.

Previously, on June 6th, Mr. Sims had cancelled previous assignments of work that plaintiffs had been given to do for defendant, with the exception of a map of the Searight pool, which plaintiff Hill was to furnish, and the making of a copy of a field study map of the Bowlegs field that plaintiff Minnis was to submit. Previous to an appointment, they had obtained to confer with Mr. Trippett at his office in Tulsa on July 12, 1963, plaintiffs wrote him a letter, dated July 8th, requesting a list of all of the leases defendant had purchased on their recommendations and also requesting that they be delivered assignments of overriding royalty under them, in accord with the hereinbefore quoted letter-agreement dated January 17, 1963. After plaintiffs' Tulsa conference with Mr. Trippett, without obtaining the overriding royalty assignments, they contacted their attorney, who wrote defendant a letter dated July 24, 1963, in which formal written demand was made for such assignments, and defendant was advised plaintiffs considered their contract with defendant terminated, because of defendant's breach of it.

Thereafter, in August, 1963, plaintiffs instituted the action involved here. Their petition was filed a day before Mr. Trippett wrote plaintiffs' attorney a letter dated August 13th, in answer to the attorney's afore-mentioned letter of July 24. In Trippett's letter, he pointed out various claimed errors in the attorney's previous letter, denied that defendant had terminated the parties' contract, and asserted that, on the contrary, this had been done by the attorney's letter. In other statements of Trippett's letter, he admitted that defendants owed the plaintiff, Minnis, "some money" for services he had rendered, and stated defendant was ready to pay him, except for the fact that it couldn't determine the correctness of the amount for which it had been billed, from what was shown on Minnis' statement.

In the petition, they filed in this action, plaintiffs set four alleged causes of action. In their first and third alleged causes of action, plaintiffs asked for an accounting of all of the oil and gas leasehold estates defendant had acquired upon their. recom-

mendations, under the the contract of January 17, 1963, and a decree requiring defendant to deliver to them overriding royalty of ⅟₁₆ of the ⅞ working interest in each of said leaseholds. Under a second cause of action, the plaintiff asked for judgment in the sum of $891.84 as the balance due the plaintiff, Minnis, for services he had rendered defendant under the contract, and expenses he had incurred in connection therewith, ending in July, 1963. Under a fourth cause of action, plaintiff alleged that said overriding royalties were "of a transitory nature" and that since defendant had not delivered them, plaintiffs had been unable to sell them, and, by reason thereof, had been damaged in the sum of $200,000.00.

In defendant's answer and amended answer, it admitted having entered into the contract sued upon, and that plaintiffs had made recommendations relating to the acquisition of acreages to be acquired by it. Defendant's amended answer further alleged:

"* * * However, instead of said recommendations being detailed and specific as contemplated by the parties to said contract, said recommendations covered huge areas of land in general areas greatly in excess of what the parties to said contract knew would be practical or feasible for the defendant to acquire for its contemplated operations, thereby attempting to assure themselves an overriding royalty interest in any leases acquired by defendant in said areas without making specific recommendations regarding specific desirable locations within said broad general areas. That in truth and in fact, neither of the plaintiffs were skilled in the manner and to the extent represented to defendant by them or as contemplated by said contract. That the acreage acquired by defendant within the areas recommended by plaintiffs was and is not desirable or commercially productive. That all of said express and implied warranties and covenants made by plaintiffs and relied upon by defendant were false and untrue. That the plaintiffs failed and refused without cause or provocation to perform said contract but instead wholly breached the same, wholly failed to perform the same and wholly repudiated the same, thereby relieving your defendant from any obligation to further perform the same. That by reason of said failure of consideration on the part of the plaintiffs and each of them, their breach of warranties and covenants, their fraud and misrepresentations, their willful failure to perform said contract, their incompetence and lack of qualifications and their repudiation of said contract, the plaintiffs and neither of them are entitled to any relief as prayed for in their petition or otherwise.

"(5) That with reference to the alleged Second Cause of Action set forth in the petition, your defendant expressly denies that the defendant is indebted to the plaintiff R. E. Minnis, Jr. in the sum of $891.84 or any other sum and denies that the alleged itemized statement of account set forth in "Exhibit C" of the petition is true and correct; that the services therein set forth were rendered by said plaintiff, R. E. Minnis, or that the charges therefor were reasonable or correct. * * *."

Accompanying defendant's answer was a cross petition in which it adopted the answer's allegations concerning plaintiffs' alleged breach of the parties' contract, alleged that, as a result of reliance on said contract and plaintiffs' "warranty * * * covenants and representations", it had incurred expenses of $400,000 in acquiring oil and gas leases and undertaking an extensive secondary recovery program, and had thereby been damaged in that sum, for which it prayed judgment against plaintiffs, together with costs, a reasonable attorney's fee, and such other relief as the court deemed just.

After plaintiffs had filed a reply to defendant's amended answer and cross petition, together with an answer to defen-

dant's cross petition, in the form of a general denial, the cause came on for trial without a jury in November, 1964.

Before counsel for either party had made an opening statement, the defendant, through its counsel, offered to assign to plaintiffs all of the overriding royalties to which they would be entitled, if the contract sued upon was specifically performed. Plaintiffs did not accept this offer, their counsel stating that it was their position that defendant's contracted-for delivery of the overriding royalty assignments was due when it acquired the leases involved, which was then approximately 20 months ago, that this part of the primary terms of said leases had elapsed, and that therefore said royalties were not then worth as much as they had been when their delivery to plaintiffs was due under the contract.

It would serve no useful purpose to detail the evidence introduced at the trial which lasted more than 3 days. It is reflected in a casemade of more than 800 pages. Suffice it to say at this point that the controversy between plaintiffs and the defendant was indicated to have arisen largely as a result of a difference of professional opinions between plaintiffs and defendant's aforementioned petroleum engineer, Weatherford, who testified he supervised the drilling, deepening, reworking, or attempted recompletion of the 12 wells, on which the defendant performed work in the four above-mentioned projects. Mr. Weatherford testified, as a witness for defendant, among other things in substance, that he first differed with plaintiffs' afore-mentioned recommendations of April 25, 1963, as to evaluation procedures in the drilling of the aforementioned "O–2 McDonough" or "McDonough O–2" well, which was the first one defendant drilled in the Susie project. He testified that plaintiffs wanted to take samples of every showing of oil encountered in this well below the bottom of its surface pipe, and to drillstem all showings encountered in drilling down to the first Wilcox sand. Weatherford testified he was opposed to this procedure because it was very expensive, and, in his opinion, unnecessary, because anything above the Wilcox "was not important to us at the time we began this development." Weatherford's testimony described other procedures, unnecessary to detail, in which his opinion and the recommendations of the plaintiffs differed. His testimony shows that, as a result of these conflicts, plaintiffs' recommendations were not followed, and they became disgruntled and dissatisfied with defendant's prosecution of the work that they considered necessary to the success of the subject secondary recovery program. As the work was carried out on these wells—deviating in several respects from plaintiffs' advice and recommendations—there is little question from the undisputed evidence but that the results thereof did not measure up to Mr. Trippett's expectations when he negotiated the subject contract with plaintiffs.

The evidence strongly indicates that, when the Susie project was launched, all parties had hopes that it might be as successful in recovering theretofore unproduced oil, as the Cities Service Company's Burden and Lacey leases, which, according to the evidence, had produced more than a million, and 248,000, barrels of oil, respectively, in secondary recovery projects from the same geological formation underlying defendant's Susie project. It also appeared from the evidence that defendant's officials had become convinced that few, if any, of the leases, whose purchase was recommended by plaintiffs, were suitable for water-flooding and that said leases—with the exception of the Nitey lease in defendant's Little River project—had little value, and would never repay the thousands of dollars defendant had expended for, and upon, them. The evidence does not unequivocally show whether or not this would have been the result, if plaintiffs' recommendations as to drilling procedures, had been followed. It is an undisputed fact, however, that no water flooding was ever commenced on any of the leases involved. Defendant elicited testimony from its witness, Weatherford, and to independent consulting petroleum engineers, Wanenmacher

and Kaveler, to the effect that the initial, or primary, production in the areas involved resulted from a "water drive", rather than a "gas drive", and that substantially all of the oil that could be removed from the Wilcox sand there, had been removed by the original wells drilled years ago, except for isolated pockets, or pools, that had never been penetrated by a drill. At least one of these witnesses attributed the Cities Service Company's success with the Burden and Lacey leases to increased pumping with Reda pumps, and a sort of "trough" situation in the producing formation, which he said does not exist under defendant's Susie leases. The tenor of their testimony was that Cities Service's operations could not be called "water flooding". Plaintiffs' testimony was to the effect that the low bottom hole pressure of the wells in the area indicated that it was originally a "gas drive" area, and therefore a suitable one for the use of water flooding as a secondary recovery vehicle.

When Mr. Trippett was interrogated on cross examination, he testified that he had never called upon plaintiffs to perform any services that they had not rendered, and that they had "followed through" on all assignments given them. He further testified, among other things, that the leases defendant had purchased on plaintiffs' recommendations had been taken for the short two-and three-year primary terms, with the idea that these terms would be extended by subsequent production. But there was also testimony to the effect that, after water injection is started in a water flooding project, it usually requires a year and a half, or two years, of such injection to load an oil-bearing sand with enough water to transport the remaining oil in it, to the bore holes, or drainage patterns, of the wells used for bringing it to the surface.

As to the measure of plaintiffs' alleged damages from defendant's failure to assign them the overriding royalties referred to in the parties' contract, plaintiffs' witness, C. V. Sidwell, a consulting petroleum engineer and geologist, with years of experience in appraising oil properties for various U. S. Military Departments, testified, over defendant's objection, that these royalties had a value on July 1, 1963, of $250.00 per acre, which had decreased to $75.00 per acre by the time the case was tried. Defendant's witness, Wanenmacher, testified that, in his opinion, the "over all value" of the royalties was only "four to five dollars an acre over this whole spread" as of January 17, 1963, and, when asked his opinion as to their "present value", this witness (using his slide rule on cross-examination) computed said value at $1.15 per acre. The defendant's witnesses, W. J. Haning and Herman Bishop, testified that they paid $15.00 to $25.00 per acre for the leases they purchased for defendant in the involved areas. Mr. Bishop also testified that, "by rule of thumb", the market price of a $\frac{1}{16}$th overriding royalty is "usually about twice" the market price of a $\frac{1}{16}$th working interest; but Mr. Haning testified, in substance, that, whether such a royalty interest would bring that much more than such a working interest, would depend on several factors that he mentioned. Haning further testified that there *was never* any market for the overriding royalty interests in the four projects involved.

At the close of the evidence on November 13, 1964, the court took the case under advisement, and both plaintiffs and defendant were given 20 days in which to submit briefs and proposed findings of fact and conclusions of law. Thereafter, the case was reopened for the introduction of additional evidence, on May 10, 1965, and, after the parties had rested that day, the court announced his judgment in accord with the findings of fact and conclusions of law submitted by the plaintiffs. By said judgment, the court found, among other things, that defendant was indebted to the plaintiff, Minnis, in the sum of $891.84 for services he had rendered it, and that said sum had been due on July 1, 1963. It was decreed that Minnis have judgment for said sum, with 6% interest from said date. The court also found, in effect, that plaintiffs had performed their obligations under

their aforementioned contract of January, 1963, with defendant, and that consequently they were entitled to the royalty interest therein prescribed in the leases covering 3960 areal acres defendant had acquired on their recommendations (except the "Doenges acreage") which was found to be the equivalent of 1445½ overriding royalty acres. By an evaluation of the evidence indicated in its written findings, the court found that plaintiffs had been damaged in the sum of $30.00 per acre, on account of defendant's breach of the contract by refusing to timely assign these royalty interests to them. Judgment of $43,365.00, as such damages, was rendered for plaintiffs against defendant (plus the aforementioned $891.84 for Minnis) and, additionally, plaintiffs were decreed to have judgment for specific performance of the contract as to defendant's aforementioned "Nit(e)y lease" requiring defendant to deliver to plaintiffs an overriding royalty of an undivided ¼₆ of the ⅞ interest in that leasehold estate covering 80 acres. The court further found that defendant had "wholly failed to prove the allegations of its Cross-Petition * * *", and same was dismissed at defendant's cost.

After the overruling of its motion for a new trial, defendant perfected the present appeal.

▆▆▆ The first proposition defendant urges for reversal is as follows:

"THE ALLEGED CONTRACT BY WHICH PLAINTIFFS SEEK TO RECOVER DAMAGES FOR FAILURE TO CONVEY OVERRIDING ROYALTY INTERESTS OR FOR SPECIFIC PERFORMANCE IS TOO INDEFINITE, VAGUE AND UNCERTAIN TO CONSTITUTE AN ENFORCEABLE CONTRACT."

We decline consideration of defendant's arguments under this proposition. As said in Midwest Eng. & Const. Co. v. Electric Regulators Corp., Okl., 435 P.2d 89, 100: "This argument seems to be an after thought, and an attempt to inject an issue into this appeal not joined at the trial of

the case." An examination of the record in this case readily reveals that neither in defendant's pleadings, including its cross petition for damages against plaintiff on the theory that they had been guilty of a breach of the parties' contract, nor at any stage of the trial of this case did it assert, or take the position, that said contract was void and unenforceable on account of indefiniteness or uncertainty. Furthermore, it cannot deny, on the basis of the evidence showing that it acted upon the parties' agreement, paid plaintiffs a total sum of $13,000.00 for "per diem" work and expenses under it, and, at the trial, tendered the overriding royalties sued for, that it considered same a valid, binding, and, at least partially executed, contract. Paraphrasing what we said in Midwest Eng. & Const. Co., supra, we do not think defendant can now be heard to contend otherwise. Such contentions are obviously disposed of under the well-established rule stated in the seventh paragraph of the syllabus in that case, as follows:

"In an appeal of a case to the Supreme Court, the parties are bound by the theories upon which they tried it in the lower court, and cannot secure reversal on an error they invited there, or by assuming a position inconsistent with that taken there."

The arguments defendant advances under its second and third propositions are similar, and will be dealt with collectively. As we understand them, defendant seems to take the position that, according to the "overwhelming preponderance of the evidence", plaintiffs did not perform the services contemplated in the subject contract, as a condition precedent to their entitlement to the overriding royalty interests therein referred to, and therefore such "failure" of the consideration, the contract obliged them to give defendant, precluded plaintiffs from compelling delivery of the royalty assignments, defendant agreed to give them. Defendant also contends that the contract was entire and unseverable and, consequently, not one entitling plaintiffs to any recovery without complete, or

more than partial, performance of their obligations thereunder. Defendant's briefs do not specify just what plaintiffs failed to do, that they were obligated to do, for it, under the contract, but their statements infer that the contract contemplated that plaintiffs would not receive any overriding royalty interests in any one of the four projects, until it had become successful, or profitable, at water flooding. It is said that plaintiffs' "failure to perform and their repudiation of the contract, together with their failure and inability to deliver to defendant any peculiar skill, knowledge, or ability which would successfully develop the leases and their inexcusable representations that the Wilcox sands could be developed through water flooding, when they knew or should have known that the area was a depleted natural water drive area, all fully justified * * * (defendant's) refusal to deliver to * * * (them) any overriding royalty interest." In support of this argument, they cite 12 Am.Jur., "Contracts", §§ 329 and 330.

While, as hereinbefore indicated, defendant elicited testimony that the oil originally produced from the Wilcox sands in the subject area was moved out of those sands, largely by the force of a natural water drive, so that the introduction of new water into those sands would recover little, if any, additional oil, there was a sufficient conflict between the testimony of witnesses for the plaintiffs, and those for the defendant, that opposite conclusions could reasonably have been drawn on that technical subject. Furthermore, it is not unequivocally clear from the evidence that the potential success of the drilling and completion procedures recommended by plaintiffs (but rejected by defendant's petroleum engineer, Weatherford) depended solely upon their effectiveness as a vehicle in water flooding, or that plaintiffs ever specifically so represented. If they did, such representations were never proved to be misrepresentations, and the only reasonable inference to be drawn from the expert testimony, adduced on behalf of plaintiffs,

is that the success of their proposed and recommended methods was forestalled, or prevented, by defendant's failure and refusal to use them. While we have no doubt that the parties' contract contemplated that plaintiffs' services would be available to defendant throughout the evaluation, and drilling, operations, necessary to complete all four of the projects, when defendant demonstrated that it would not use those services in the manner that, according to plaintiffs' testimony, was contemplated in the parties' contract, and their talks with Trippett leading up to its signing, and also demonstrated that it would not discharge its obligation to deliver to them the royalty assignments that were a part of the consideration for those services, then, under both the authorities cited by defendant, and Midwest Eng. & Const. Co., supra (quoting Bushey v. Dale, 181 Okl. 481, 75 P.2d 193) plaintiffs were no longer obligated to offer their services, but could consider the contract repudiated, and treat it as breached, by the defendant. By its judgment, the trial court determined that defendant did not prove the allegations of failure of consideration, breach of contract, fraud and misrepresentation, etc., asserted against plaintiffs in its cross petition. We have carefully examined the record, and have concluded that said determination is amply supported by the evidence. That determination has the effect of rejecting, as unfounded, the representations made against the plaintiffs under defendant's second and third propositions, and the hypotheses upon which its fourth, eighth and ninth propositions are based. That adjudication can neither be said to be clearly against the weight of the evidence, nor to be contrary to law.

In our opinion, the foregoing adequately disposes of all of defendant's arguments for reversal, except those pertaining directly, or inferentially, to the remedy granted plaintiffs by the trial court's judgment, and advanced in connection with defendant's Propositions "VI", "V", and

"VII", which, in that order, read, respectively, as follows:

"SPECIAL DAMAGES FOR BREACH OF CONTRACT CANNOT BE RECOVERED UNLESS SPECIFICALLY PLEADED."

"THE MEASURE OF DAMAGES FOR FAILURE TO GIVE AN OVERRIDING ROYALTY INTEREST OR AN OIL AND GAS LEASE IS THE DIFFERENCE BETWEEN THE CONTRACT PRICE AND THE MARKET VALUE OF THE INTEREST TO BE CONVEYED AT THE TIME OF THE BREACH OF THE CONTRACT TO CONVEY."

"WHERE THE AWARD OF MONEY DAMAGES AT LAW IS ADEQUATE COMPENSATION FOR BREACH OF CONTRACT, EQUITY WILL NOT DECREE SPECIFIC PERFORMANCE."

In its argument under the above quoted proposition "VI", defendant refers to damages such as those, for which the trial court awarded plaintiffs $42,365.00, as "special damages". Then it quotes 25 C.J. S. Damages § 131c for the rule that special damages "must be particularly averred * * *" to warrant proof, or recovery, thereof. By the statement in defendant's initial brief that plaintiffs pleaded no special damages in their petition, and the brief's reference to the allegation in said petition indicating that the $200,000.00 in damages, plaintiffs sought, was the total sum for which they could have sold the overriding royalties, if defendant had made them available to plaintiffs, for that purpose, by timely assignments thereof contemplated in the contract, defendant infers that said allegation did not comply with the cited rule, and that, therefore, the trial court not only erred in overruling a motion it interposed to require plaintiffs to make their petition more definite and certain, but that the court also erred in allowing plaintiff, Minnis, to give testimony (over defendant's objection) to the effect that plaintiffs had intended (if assignments of the overriding

royalties had been delivered to them before July 1, 1963) to sell them.

■ Since the above arguments, and defendant's repeated characterizations of the damages plaintiffs recovered, as "special damages", are so closely related to defendant's contention under its "PROPOSITION V" that, under the time-honored rule of Hadley v. Baxendale, 9 Exch. 341, 156 Eng. Reprint 145 (discussed in 22 Am. Jur.2d, "Damages", § 56) such damages cannot be recovered for a breach of contract, unless contemplated by the parties at the time they entered into it, we think resolution of the broad question of whether the remedy afforded plaintiffs by the judgment appealed from, may stand, will, in effect, dispose of ancillary questions posed by the defendant's arguments.

■ Trippett's testimony most nearly pertaining to the subject under consideration was as follows:

"* * *

"Q. Substantially, you bought all of the 4,000 acres in February and March of 1963, did you not?

"A. Oh, I'd say that was generally correct.

"Q. All right. Now I believe you stated a moment ago that on July 12th you decided to stall plaintiffs on delivering their overriding royalty interest, (interrupted)

"A. That's right.

"Q. Prior to that time you'd not had any intimation nor problem concerning the plaintiffs, had you?

"A. We'd had an intimation, not a problem.

"Q. When did that first arise?

"A. They had mentioned the overrides probably going back, oh, a month or two before that.

"Q. Now why did you not deliver those overrides to them in February and March and April of 1963, on the leases that you had acquired that were within a reasonable time prior to that?

"A. In my opinion the contract didn't entitle them to any overrides until they completed the services which they contracted to render, which would have been several years later.

\* \* \* \* \* \*

"Q. In other words, you contemplated delivering the overrides several years later, (interrupted)

"A. Yes, sir (interrupted)

\* \* \* \* \* \*

"Q. Would you more closely define what you mean by 'delivering the overrides several years later'?

"A. Well, I contemplated that the relationship involved services in connection with all of the areas which I have previously mentioned, to-wit: Evaluation and appraisal, selection of acreage, drilling techniques, completion techniques, and techniques in operating the properties for possible production from inception to the end of their commercial life, during all of which time the plaintiffs would furnish their services in assisting to exploit all of those areas profitably and to the best interests of all concerned.

\* \* \* \* \* \*

"Q. Now you contemplated developing these properties within what period of time? Within a year, some of them?

"A. Well, we contemplated developing the— \* \* \* Susie area first.

\* \* \* \* \* \*

"Q. Was it '64?

"A. Yes, sir.

"Q. All right. Now there'd be oil production during the time that you're in operation, would there not?

"A. Yes, sir.

"Q. What would happen to the oil that was accruing to their one-sixteenth interest that you had not delivered their overriding royalty interest to?

"A. I—I really didn't think it through to that extent.

\* \* \* \* \* \*

"Q. Now you prepared this contract between you and the plaintiffs, which is identified as Exhibit 2, did you not?

"A. Yes, sir.

"Q. Did you make any recital in that contract that you did not contemplate delivering the overrides for some several years?

"A. No.

"Q. Could you explain to the Court why you didn't?

"A. I didn't even think about it. I didn't contemplate delivering them early or late in any specific terms.

"Q. You do admit to the Court that Mr. Minnis was inquiring about delivery of his overrides in the latter part of April and early in May of 1963, do you not?

\* \* \* \* \* \*

"A. I think that Mr. Minnis and Mr. Hill both made inquiry about them, yes.

"Q. Did you explain to them on those occasions that you did not intend to deliver the overrides for some several years, as you put it?

\* \* \* \* \* \*

"A. I don't think so.

"Q. All right. It was not within their contemplation that the override would not be delivered for some several years, as you've testified about, was it?

"A. I don't know. \* \* \*."

Giving the above testimony of its President, Trippett, full credence, and the most favorable interpretation to defendant possible, the letter-contract of January 17, 1963 (which, as hereinbefore noted, was drafted by him) contemplated that plaintiffs would not sell the overriding royalties (to which they would be entitled upon the happening of the prerequisite events named therein) but would retain them *all during* the development, and commercial production, stages of the four projects. Thus, under the rule of Hadley v. Baxendale, supra, plaintiffs would have been relegated, as their *only* remedy (for defendant's breach of the contract) to accepting assignments of said royalty (as tendered to them at the begin-

ning of the trial) and they could not recover the damages the trial court awarded them (in lieu of any such assignments except as to the Nitey lease). Judging from the tenor of much of the evidence, as to the likelihood that any of the other leases would ever prove commercially productive, and the evidence of the practically worthless, or greatly diminished, value of overriding royalty under a lease that has only a few months of its term remaining (or is about to be abandoned) such a remedy would largely deprive plaintiffs of the extra compensation, attractive "bonus", or thing of presumably some value, that under the contract they were to obtain for their services in connection with the leases defendant purchased upon their recommendations. But, if such was the contemplation of the parties when the contract was entered into (to wit: plaintiffs were not to have the assignments until the leases were fully developed—a period of a year, or more, after they had been obtained) then it is passing strange that Mr. Trippett found it necessary to "stall" plaintiffs on their request for the assignments in May and June of 1963, which was only 30 to 60 days after the leases were obtained. In view of plaintiff Hill's testimony that he had previously done similar work for the Ashland Company in Seminole County's West Carr City area, for which he received overriding royalty that he had later sold, it is reasonable to assume that he and plaintiff, Minnis, contemplated a similar arrangement with defendant, and that, when they endorsed their acceptance of the letter-contract, they thought that under its terms—if defendant purchased leases they recommended in the areas they and Trippett had discussed together—they would obtain overriding royalties they could sell at their highest speculative values. Although its briefs suggest that defendant did not undertake the four projects, here involved, to create any speculative, or "boom", market for leases and royalty in the area in which they were to be located, and that neither of the parties contemplated, when they entered into the contract, that plaintiffs would be enabled to take advantage of such a market, to sell the overriding royalty they earned under the contract, at a monetary gain, or profit, to themselves, we think that, on the basis of the evidence in this case, the issue of whether such was the parties' intention, was a question of fact for the trial court. The parties' briefs cite no case directly in point, but, as to the damages questions here involved, we think that, under Whiteside v. Trentman, 141 Tex. 46, 170 S.W.2d 195, Martin v. Darcy (Tex.Civ.App.) 357 S.W. 2d 457, 4 A.L.R.3rd 278, and the principles recognized in the better-reasoned cases discussed in the annotation to the latter case (see 4 A.L.R.3rd 284, 303, 305–311) the judgment of the trial court resolving that question in favor of the plaintiffs, and awarding them the special damages (for which the testimony of the witnesses named in its finding of fact provided a sufficient basis) can, and should be upheld. As to this subject, and related ones, notice also Tit. 23, O.S.1961 § 21, and 22 Am.Jur. 2d "Damages", §§ 57–62, both inclusive. Under the cited authorities, we find no error in the trial court's admission of the testimony complained of, nor in its award of damages.

█ In its arguments under its "PROPOSITION VII", defendant complains of being compelled, by the judgment appealed from, to specifically perform the contract, to the extent of delivering to plaintiffs an assignment (like those therein described) as to the Nitey lease, contemporaneous with an award of damages, in lieu of such assignments, as to the other leases. They suggest that, in so doing, the trial court gave plaintiffs the contract's greatest potential benefit as to that lease, and infer that, if the court's award of damages was an adequate remedy for the contract's breach as to the other leases, then, under the rule its brief quotes from 81 C.J.S. Specific Performance § 6b, p. 415, said court should not have granted specific performance as to any of the leases. On the other hand, plaintiffs contend that the dual nature of the relief, granted them by the trial court, was proper, and,

among the citations they present in support of this contention, is an annotation in 95 A.L.R., beginning at p. 228, quoting, among other statements from 25 R.C.L. 437, the following:

"Equity may in proper cases grant specific performance of a contract *and in addition direct the payment of damages. For example, if a defendant has partially disabled himself from carrying out the contract, he may be decreed to perform specifically so much as he is still able to perform,* and the plaintiff may recover damages for the residue. * * *." (Emphasis added.)

From the evidence in this case indicating that, between the time defendant acquired it, and the date of the trial, the Nitey lease had produced more oil than any of the other leases in the four projects, and reasonable inferences from other evidence that the other leases are not producing oil in such quantities as to make them sufficiently profitable to warrant extension of their primary terms, we think the trial court was justified, under the above quoted rule, and the discretion allowed it in such matters, in granting plaintiffs specific performance of the contract, as to the Nitey lease. Here, the evidence indicated that by its "stalling", delay, and/or refusal to give plaintiffs the royalty assignments, to which they were entitled (according to the inferences to be drawn from the trial court's findings) on July 1, 1963, at the latest, defendant "disabled" itself from giving plaintiffs the full consideration, to which the court found they were entitled under the contract—except as to the Nitey lease. As it appears that, as to that lease, plaintiffs may yet derive the full benefit, to which (according to said court's judgment) they were entitled, as to *all* of the leases, we think it was entirely proper, and within the trial court's equitable powers, to order specific performance of said contract as to that lease.

As we have found no cause for its reversal in the arguments presented by defendant, the judgment of the trial court is hereby affirmed.

JACKSON, C. J., IRWIN, V. C. J., and DAVISON, WILLIAMS, BERRY and HODGES, JJ., concur.