RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0217p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

BAKER HUGHES INCORPORATED; BAKER PETROLITE CORPORATION,

                               *Plaintiffs-Appellants*,

     *v.*

S&S CHEMICAL, LLC; BRUCE NEAL STEVENS; SPE WAX TECHNOLOGIES, LLC,

                               *Defendants-Appellees*.

No. 15-2413

> Appeal from the United States District Court
> for the Western District of Michigan at Grand Rapids.
> No. 1:14-cv-00531—Robert Holmes Bell, District Judge.

Argued: July 27, 2016

Decided and Filed: September 2, 2016

Before: GILMAN, WHITE, and STRANCH, Circuit Judges.

_____

## COUNSEL

**ARGUED:** David W. Centner, CLARK HILL PLC, Grand Rapids, Michigan, for Appellants. Dean W. Amburn, HOWARD & HOWARD ATTORNEYS PLLC, Royal Oak, Michigan, for Appellees. **ON BRIEF:** David W. Centner, Gregory N. Longworth, CLARK HILL PLC, Grand Rapids, Michigan, for Appellants. Dean W. Amburn, Gerald E. McGlynn III, HOWARD & HOWARD ATTORNEYS PLLC, Royal Oak, Michigan, for Appellees.

1

———————————

**OPINION**

———————————

RONALD LEE GILMAN, Circuit Judge.  Bruce Stevens worked for Baker Petrolite Corporation and its predecessor for approximately seven years.  When his employment ended, Stevens signed a contract in which he promised to maintain the confidentiality of Baker Petrolite's trade secrets.  Baker Petrolite and its parent company, Baker Hughes Incorporated (collectively, Baker), sued Stevens 18 years after the contract was signed, alleging a breach of their confidentiality agreement.  Stevens's defense, and the outcome of this case, hinges on the validity of a broadly worded settlement agreement that was purportedly reached in the interim as a result of an unrelated lawsuit between the parties.  Relying on this settlement agreement, the district court entered judgment in favor of Stevens.  For the reasons set forth below, we **AFFIRM** the judgment of the district court.

**I.  BACKGROUND**

**A.     The parties and the disputed settlement agreement**

Baker produces and sells chemicals such as polyethylenes, alcohols, and copolymers.  These operations involve proprietary "ethylene polymerization processes" (the EP Processes), which allegedly constitute trade secrets under state law.

Stevens worked for Baker and its predecessor from 1989 until 1996.  His employment involved extensive use of the EP Processes.  When Stevens's employment ended, he signed a Termination Agreement in which he promised not to disclose any information or data related to Baker's business or technology, including trade secrets such as the EP Processes.

In October 1999, Stevens sued Baker in Oklahoma state court.  Stevens alleged that Baker had failed to fully pay the compensation due him during his employment.  The parties eventually settled Stevens's lawsuit.  In consummation of the settlement, Baker paid Stevens $10,000, and Stevens dismissed his lawsuit against Baker with prejudice.

The parties dispute the remaining terms of the settlement. In particular, the negotiations preceding the cash payment to Stevens involved the circulation of several drafts of a proposed settlement agreement that included a release of all claims. A purported final draft (the Settlement) was sent from Baker to Stevens's attorney, Robert Giles, on March 30, 2000. Stevens and Giles signed the Settlement the following day. Giles then faxed a copy of the signed Settlement to Baker's attorney, Steven Broussard, on April 7, 2000. That same day, Broussard forwarded a copy of the Settlement to Baker's in-house counsel, Jeff Shank. The Settlement contained signature blocks for both Broussard and for a representative of Baker, but the record has no copy of the Settlement showing that either Broussard or a Baker official ever signed the document. Instead, the record contains only the copy of the Settlement signed by Stevens and Giles on March 31, 2000 and faxed to Baker on April 7, 2000.

The terms of the Settlement are consistent with the above-described resolution of Stevens's Oklahoma lawsuit insofar as the Settlement required Stevens to dismiss his complaint in exchange for $10,000. The Settlement, however, has additional terms. As relevant to the current appeal, the Settlement contains a general release (the Release Provision) that provides as follows:

> Except for the obligations set forth in this Agreement, Baker hereby fully and forever remises, releases and discharges Stevens and his attorneys, agents, heirs, executors, administrators, predecessors, successors and assigns (collectively referred to as the "Stevens Release Parties"), of and from any and all claims, demands, agreements, contracts, covenants, suits, actions, causes of action, obligations, controversies, debts, costs, expenses, damages, judgments, losses and liabilities, of whatever kind or nature, in law, equity or otherwise, whether known or unknown, concealed or hidden, against any of the Stevens Released Parties which Baker has had, may have had or now has, to and including the date of this Agreement.

> It is the intention of the parties to this Agreement that the foregoing general releases shall be effective as a bar to all actions, causes of action, suits, claims or demands of every kind, nature or character whatsoever, known or unknown, suspected or unsuspected, fixed or contingent, referred to above. . . .

**B.      Stevens's subsequent activities**

In or around 1999, Stevens formed S&S Chemical, LLC (S&S) as a Colorado limited liability company for the purpose of producing polyethylene products.  Baker subsequently came to suspect that S&S was improperly using Baker's EP Processes in doing so.  This caused Baker to send Stevens a letter in 2002 reminding Stevens that he had previously promised (in the Termination Agreement) that he would not disclose information relating to the EP Processes or to Baker's other trade secrets.  Stevens responded that he and his company had independently developed the processes used to manufacture S&S's chemicals, and Baker later confirmed that S&S was not then using Baker's confidential information.

Several years later, Baker again came to suspect that Stevens and S&S were using Baker's EP Processes.  This suspicion arose from a 2013 press release in which S&S announced that it was producing a new line of polymer chemicals.  Baker's investigation concluded that S&S's production likely involved the use of Baker's trade secrets.  In addition, Baker learned during its investigation that Stevens and S&S had sold certain intellectual property to SPE Wax Technologies, LLC (SPE).  Baker determined that this sale likely involved the disclosure of the EP Processes or other information that Stevens had previously promised not to divulge.

**C.      Baker's lawsuit**

Based on its investigation, Baker sued Stevens, S&S, and SPE (collectively, Defendants) in May 2014 in the United States District Court for the Western District of Michigan.  Baker alleged in relevant part that (1) Stevens had breached the Termination Agreement by disclosing Baker's trade secrets to SPE, and (2) Defendants had misappropriated Baker's trade secrets by using the EP Processes.

Baker filed an amended complaint in June 2014, and the district court entered a case-management order in December of that year.  The court's order required the parties to make their initial disclosures as mandated by Rule 26(a) of the Federal Rules of Civil Procedure by January 14, 2015.  In addition, the court later imposed a deadline of July 30, 2015 for the completion of lay-witness discovery.

Defendants timely made their initial disclosures. The disclosures listed 79 individuals likely to have discoverable information, but the list did not include Robert Giles, the attorney who had represented Stevens in the Oklahoma state-court litigation. Giles's name did not surface until Baker located and produced a copy of the Settlement during subsequent discovery.

In April 2015, Baker filed a second amended complaint, again alleging breach of contract and the misappropriation of trade secrets. Defendants answered the amended complaint the following month. In doing so, they asserted as an affirmative defense that Baker's claims were barred by the Release Provision. As support, Defendants cited the Settlement that the parties had allegedly entered into in connection with the resolution of Stevens's 1999 Oklahoma lawsuit against Baker. They noted that the Settlement's Release Provision applied to all "demands, agreements, contracts, . . . [and] obligations . . . of whatever kind or nature." As a result, Defendants asserted that Baker had released Stevens from the confidentiality obligations of the Termination Agreement, thereby undercutting Baker's misappropriation and breach-of-contract claims. Defendants attached as Exhibit A to their answer a copy of the Settlement that Stevens and Giles had signed on March 31, 2000. At no point, however, did Defendants supplement their disclosures under Rule 26(a) to identify Giles as a person having information that would be used to support their claims or defenses.

In August 2015, Defendants filed a motion for summary judgment on the basis that Baker's claims were barred by the Release Provision. Included with the motion were (1) a declaration from Giles regarding his role in the resolution of the Oklahoma lawsuit, and (2) a copy of Giles's billing records from his work on that lawsuit.

Baker responded to the motion by, among other things, moving to strike Giles's declaration and billing records on the grounds that Giles had not been identified in Defendants' Rule 26(a) disclosures and that Giles's billing records had not been produced during discovery. It also asserted that (1) Giles's declaration was improper under Rule 56(c)(4) of the Federal Rules of Civil Procedure because it contained speculation and legal conclusions, and (2) the billing records were inadmissible because they had not been authenticated and/or because they contained hearsay.

The district court granted Defendants' motion for summary judgment in October 2015. It first addressed and rejected Baker's motion to strike Giles's declaration and billing records. The court then cited Giles's declaration and records in concluding that the parties had assented to the terms of the Settlement and that the Settlement constituted a valid contract under Oklahoma state law.

It next proceeded to interpret the terms of the Settlement. The district court determined that the Release Provision unambiguously released Stevens from the obligations of the Termination Agreement. As a result, the court concluded that Stevens was not liable for breach of contract. In addition, the court decided that, without an underlying breach of contract, there had been no "improper" use or disclosure of Baker's trade secrets. The court thus concluded that Defendants were not liable for the alleged misappropriation of Baker's EP Processes.

Baker now appeals. It first asserts that the district court erred in concluding that the Settlement is a valid contract, primarily because the record does not contain a copy of the Settlement that is signed by Baker. Baker next argues that the court should have struck Giles's declaration and records. It maintains that Giles and his records were not disclosed during discovery, with the consequence that they should have been excluded from the court's consideration under Rule 37 of the Federal Rules of Civil Procedure. Baker also asserts that Giles's declaration violated Rule 56(c)(4) of the Federal Rules of Civil Procedure because it was not based on personal knowledge. Finally, Baker contends that the court erred in interpreting the Settlement by failing to consider the parties' conduct post-dating the resolution of Stevens's Oklahoma lawsuit.

## II. ANALYSIS

### A.  Standards of review

Baker first challenges the district court's grant of summary judgment in favor of Stevens. We review de novo the court's decision to grant summary judgment. *See Watson v. Cartee*, 817 F.3d 299, 302 (6th Cir. 2016). Summary judgment is appropriate when, construing the facts and drawing all reasonable inferences in favor of the nonmoving party, there is no genuine dispute regarding any material fact and the moving party is entitled to judgment as a matter of

law.  *Rocheleau v. Elder Living Constr., LLC*, 814 F.3d 398, 400 (6th Cir. 2016); Fed. R. Civ. P. 56(a).

Baker next challenges the district court's refusal to strike Giles's declaration and billing records in accordance with Rules 37(c)(1) and 56(c)(4) of the Federal Rules of Civil Procedure. We review such rulings "under the highly deferential abuse-of-discretion standard." *See Ondo v. City of Cleveland*, 795 F.3d 597, 603 (6th Cir. 2015) (internal quotation marks omitted); *see also Briggs v. Potter*, 463 F.3d 507, 511 (6th Cir. 2006) (applying the standard to a dispute under Rule 56(c)(4)'s predecessor).  An abuse of discretion occurs if the district court "relies on erroneous findings of fact, applies the wrong legal standard, misapplies the correct legal standard when reaching a conclusion, or makes a clear error of judgment."  *Ondo*, 795 F.3d at 603 (internal quotation marks omitted).

Baker finally challenges the district court's interpretation of the Settlement.  We review contractual interpretations de novo.  *Meridian Leasing, Inc. v. Associated Aviation Underwriters, Inc.*, 409 F.3d 342, 346 (6th Cir. 2005).

**B.       The district court correctly concluded that the Settlement is a binding contract**

The district court granted summary judgment in favor of Defendants on Baker's breach-of-contract and misappropriation claims on the ground that Baker had released Stevens from his underlying confidentiality obligations.  Baker concedes that the Release Provision is applicable to Stevens's Termination Agreement if the Settlement is indeed binding on Baker, but it argues that a genuine factual dispute exists with regard to whether the Settlement was agreed to by Baker.  As explained below, we conclude that no such dispute exists and that the Settlement is binding.

*1.       Choice of law and principles of contract formation*

The district court had jurisdiction based upon the parties' diversity of citizenship, so we apply the choice-of-law rules of the state in which the district court sits—in this case, Michigan. *See Performance Contracting Inc. v. DynaSteel Corp.*, 750 F.3d 608, 611 (6th Cir. 2014). Applying Michigan's rules, the court concluded that Oklahoma law governed its evaluation of

the Settlement. The parties do not challenge this conclusion on appeal, so we likewise apply Oklahoma law. *See Wilton Corp. v. Ashland Castings Corp.*, 188 F.3d 670, 673 n.2 (6th Cir. 1999) ("We need not inquire into choice-of-law issues; the parties did not dispute that Ohio law applied.").

A valid contract in Oklahoma consists of four elements: "Parties capable of contracting," "consent," a "lawful object," and "[s]ufficient cause or consideration." Okla. Stat. tit. 15, § 2. The parties in this case dispute only whether there was mutual consent to the terms of the Settlement.

Consent to contractual terms is reached through the process of offer and acceptance. *Garrison v. Bechtel Corp.*, 889 P.2d 273, 281 (Okla. 1995) ("Every contract results from an offer and acceptance."); *Nat'l Outdoor Advert. Co. v. Kalkhurst*, 418 P.2d 661, 664 (Okla. 1966) ("It is an elementary rule of law in this jurisdiction that in order to constitute a contract there must be an offer on the part of one and an acceptance on the part of the other.").

An "offer" is an "expression of a person's willingness to become, according to the terms expressed, a party to an agreement." *Strahm v. Bd. of Trs. of Benevolent & Protective Order of Elks, Tulsa Lodge 946*, 225 P.2d 159, 161 (Okla. 1950) (citation omitted). To give rise to an enforceable contract, the offer must contain enough detail that the terms of the contract can be "ascertained with a reasonable degree of certainty." *Brown v. Bivings*, 277 P.2d 671, 673 (Okla. 1954); *see also* Okla. Stat. tit. 15, § 104 (providing that a contract is void if its terms are "so vaguely expressed as to be wholly unascertainable").

An "acceptance" is an "expression of the intent to accept the offer, by word, sign, writing or act, communicated or delivered to the person making the offer or the offeror's agent." *Garrison*, 889 P.2d at 281. A party can demonstrate its acceptance by performing according to the terms of an offer or by accepting the consideration accompanying the offer. *Hardin v. First Cash Fin. Servs., Inc.*, 465 F.3d 470, 476 (10th Cir. 2006) ("In general, Oklahoma follows traditional contract principles in permitting acceptance of an offer by performance: 'Performance of the conditions of a proposal, or the acceptance of the consideration offered with a proposal, is an acceptance of the proposal.'" (quoting Okla. Stat. tit. 15, § 70)).

To constitute a valid acceptance, the response to an offer must be "unconditional" and "identical to the offer." *Ollie v. Rainbolt*, 669 P.2d 275, 280 (Okla. 1983). If the response instead imposes conditions or "introduces a new and material term," then the response constitutes a counteroffer that the original offeror may accept or reject. *Midwest Eng'g & Constr. Co. v. Elec. Regulator Corp.*, 435 P.2d 89, 96 (Okla. 1967) (citation omitted). Acceptance of the counteroffer results in the formation of a valid contract. *Id.*

### 2. *The parties consented to the terms of the Settlement*

Based on the foregoing principles, we conclude that Baker and Stevens consented to the terms of the Settlement through the process of offer and acceptance. This process began when the parties entered negotiations in December 1999 to settle Stevens's Oklahoma lawsuit. Several months later, on March 30, 2000, Baker sent to Stevens's attorney a draft of the Settlement that was titled "Settlement Agreement and Full and Final Mutual Release of Claims." This draft set out the terms of the proposed settlement, including the provisions that (1) Baker would pay Stevens $10,000, (2) Stevens would dismiss his lawsuit with prejudice, and (3) the parties would release all claims and obligations against each other by assenting to the Release Provision. The draft thus easily contained enough detail so that the Settlement's terms could be "ascertained with a reasonable degree of certainty." *See Brown*, 277 P.2d at 673. In addition, Baker's conduct in sending the draft to Stevens indicated that Baker was willing to enter into an agreement with Stevens based on the terms expressed therein. As a result, the transmission of the Settlement to Stevens constituted an offer. *See Strahm*, 225 P.2d at 161 (defining an "offer" as an "expression of a person's willingness to become, according to the terms expressed, a party to an agreement").

The offer was then accepted. First, Stevens and his attorney signed the draft of the Settlement, thereby demonstrating their assent to its terms. *See Garrison*, 889 P.2d at 281 (noting that an "acceptance" may be accomplished "by word, sign, writing or act"). Second, Stevens did not add or delete any terms or otherwise make any changes to the draft; instead, he simply signed the copy of the draft that Baker had transmitted. Stevens thus unconditionally assented to an agreement containing the exact same terms as contained in Baker's offer. *See Ollie*, 669 P.2d at 280 (observing that an acceptance must be "unconditional" and "identical

to the offer"). Finally, Stevens communicated his acceptance to Baker when his attorney, Giles, faxed the signed draft of the Settlement to Baker's counsel. This transmission completed Stevens's acceptance of the Settlement. *See Garrison*, 889 P.2d at 281 ("[An acceptance] must be . . . communicated or delivered to the person making the offer or the offeror's agent."); *see also* Okla. Stat. tit. 15, § 51 ("The consent of the parties to a contract must be . . . [c]ommunicated by each to the other."). As a result of this offer and acceptance, we conclude that the Settlement—including the Release Provision—is a binding contract between Baker and Stevens.

Baker contests this result on several grounds. It first argues that a genuine dispute of material fact exists because the record does not contain a copy of the Settlement signed by Baker. This omission from the record ostensibly "creates a strong inference" that Baker did not assent to the Release Provision, leading Baker to conclude that the district court should have allowed Baker's claims to go to a jury.

We find this argument unpersuasive. First, nothing in the record suggests that Baker's offer was expressly conditioned upon Baker later signing the Settlement. *Cf. Herren v. Okla. Nat. Gas Co.*, 166 P.2d 95, 96 (Okla. 1946) (noting that an offer may be conditioned upon the happening of later events); Restatement (Second) of Contracts: To Whom an Offer is Addressed § 29 cmt. a (Am. Law Inst. 1981) (observing that an offeror may limit an offeree's power of acceptance). Second, the Oklahoma Supreme Court has specifically observed that "it is not always necessary that a written contract be signed by the parties[] to become a binding contract." *Stewart v. Bd. of Educ., Sch. Dist. No. 2, Stephens Cty.*, 230 P. 504, 505 (Okla. 1924). We are therefore unpersuaded by Baker's argument that the absence of a fully signed copy of the Settlement necessarily "creates a strong inference" that no mutual consent was reached.

Moreover, the Oklahoma Supreme Court explained in *Stewart* that a "contract signed by but one of the parties thereto is binding upon both, when acts thereunder have been performed by both parties." *Id.* (citation omitted). In the present case, both parties undisputedly performed according to the terms of the Settlement. Baker paid Stevens $10,000 and Stevens dismissed his Oklahoma lawsuit, just as the Settlement required. So even if Stevens's transmission of the

Settlement to Baker did not in and of itself form a valid contract, the parties' subsequent conduct caused the Settlement to become binding. *See id.*; *see also* Okla. Stat. tit. 15, § 70.

Nor are we concerned with whether the parties performed each and every obligation imposed by the Settlement. This is because "the beginning of performance or a tender of part performance operates as a promise to render complete performance." Restatement (Second) of Contracts: Acceptance of Offer Defined; Acceptance by Performance; Acceptance by Promise § 50 cmt. b (Am. Law Inst. 1981); *see also Dixon v. Dalton*, 12 P.2d 1108, 1109 (Okla. 1932) (noting that, when one of the parties has "accepted the benefits of partial performance" of a contract, that party cannot "escape the burdens of the contract"). So when Baker performed at least part of the requirements of the Settlement by paying Stevens $10,000, Baker became bound to fulfill all of its obligations under the Settlement—including those in the Release Provision. The release therefore became binding on Baker by virtue of Baker's performance according to the Settlement's terms.

Baker next attempts to distinguish *Stewart* on the ground that the Oklahoma Supreme Court in that case ultimately allowed the plaintiff's claims to go to a jury. As a result, Baker concludes that an unsigned contract necessarily creates a factual dispute that cannot be resolved on summary judgment.

This argument misreads *Stewart*. In that case, the contract at issue was an employment agreement between a teacher and a city school board. The Oklahoma Supreme Court described the facts as follows:

> The city superintendent, for two years prior to the employment here in question, had employed the teachers and entered into written contracts with them, and thereafter presented the contracts to the school board for approval. Plaintiff had taught one year, and was employed for a second term by the city superintendent at a salary previously fixed by the board. She, like all other teachers employed for that year, signed the written contract presented by the city superintendent, and he then indicated his approval by signing it as city superintendent. Under this employment, she entered upon her duties as teacher at the opening of the fall term, and taught until the 9th of November following, when she was discharged by the board. She had been paid her salary for the first month, and had taught three or four days on her second month at the time of her discharge. At the time of

her discharge, the contract was still held by the city superintendent and had never
been presented to the school board for approval.

230 P. at 505.

After her discharge, the plaintiff in *Stewart* sued to recover one month of salary that she
was allegedly owed. *Id.* at 504. The school board defended on the basis that the employment
agreement was not binding because the contract had not been signed by the board and the parties
had not performed according to the agreement. *Id.* at 505. In particular, the board argued that
any earlier payment to the teacher had been made without the board's knowledge or approval,
such that those payments did not constitute acceptance through performance. *Id.* ("It is
contended by the defendant that plaintiff's evidence did not show . . . that the one month's pay
which she had received was made with the knowledge of the school board or any of its
members."). The plaintiff, in contrast, contended that the board had in fact "recognized her
employment by authorizing her to be paid one month's salary." *Id.* Based on these contentions,
a factual dispute existed regarding the board's knowledge, making a trial necessary to resolve the
case. *See id.*

The present case presents no analogous factual conflict. Baker itself transmitted the draft
of the Settlement to Stevens, received a copy of the Settlement signed by Stevens and Giles, and
undisputedly paid Stevens the $10,000 specified in the Settlement. Thus, unlike the school board
in *Stewart*, Baker unquestionably knew of and approved each step that gave rise to the contract at
issue. There accordingly exists no genuine dispute regarding the parties' knowledge that would
preclude summary judgment.

### 3. *Giles's billing records do not create a genuine dispute of material fact*

Baker next argues that Giles's billing records preclude summary judgment because they
create uncertainty about the exact terms of the Settlement. This argument relies on (1) records
from February 16, 2000 to April 18, 2000, and (2) records from December 24, 1999 to January
20, 2000.

### a. Records from February through April

Baker first cites Giles's billing records from February through April of 2000:

| | | |
|---|---|---|
| 02/16/00 | Legal Work. Review release proposed by Baker Petrolite. Email client re same. | 0.25<br>125.00/hr |
| 02/25/00 | Teleconference – Billable. Teleconference with client re proposed releases. RWG to redraft and circulate to opponent for comments. | 0.25<br>125.00/hr |
| 03/08/00 | Teleconference – Not Billed. Call Mr. Broussard re changes requested by RWG. New document drafted and to be faxed to RWG.<br>Relay same to client. | 0.25<br>125.00/hr |
| 03/24/00 | Teleconference – Billable. Teleconference with Mr. Broussard re final changes. Made them and faxed to RWG late afternoon. Fax copy to client. | 0.25<br>125.00/hr |
| 03/30/00 | Legal Work. Review final draft of Settelment [sic] Agreement and Full anf [sic] Final Release of Claims. All Changes made.<br>Legal Work. Receive, review and approve last draft of release. | 0.25<br>125.00/hr<br>0.25<br>125.00/hr |
| 03/31/00 | Legal Work. Review final changes to release. | 0.25 |
| 04/07/00 | Legal Work. Review and approve last changes to release. [F]ax to Attorney for Baker. | 0.25<br>125.00/hr |
| 04/14/00 | Legal Work. Fax Mr. Broussard prompter re status of settlement. | 0.25 |
| 04/15/00 | Legal Work. Draft Motion to Dismiss. | 0.25<br>125.00/hr |
| 04/18/00 | Legal Work. Approve Motion to Dismiss with minor change as requested by Mr. Broussard.<br>Legal Work. Exchange documents and receive check. | 0.25<br>125.00/hr<br>0.25<br>125.00/hr |

Baker notes that, based on these records, Giles received the Settlement with "All Changes made" on March 30, 2000. The following day, however, Giles allegedly made additional changes, as indicated by the reference to "[r]eview final changes to release" on March 31. Likewise, Baker contends that Giles made further changes to the Settlement on April 7, 2000, relying on the notation that he "[r]eview[ed] and approve[d] last changes to release." Baker thus argues, based solely on Giles's billing records, that the parties were engaged in ongoing settlement negotiations. The district court, according to Baker, therefore erred in concluding that the Settlement was a valid contract because the parties' continuing negotiations might have resulted in alterations to the terms of the parties' agreement that were not reflected in the March 30 Settlement.

We find this argument unpersuasive. Baker speculates that the parties might have entered into a contract different than the Settlement, but offers no documentary evidence of either a draft or finalized version of another purported contract. In addition, the district court specifically noted that Baker's in-house counsel admitted during his deposition that he did not have "any factual support" for the contention that the Oklahoma lawsuit was resolved on terms different than those set forth in the Settlement. Baker accordingly failed to come forward with "significant probative evidence," *see Ondo v. City of Cleveland*, 795 F.3d 597, 603 (6th Cir. 2015) (citation omitted), indicating that there exists a genuine dispute of material fact with regard to the Settlement's validity.

Moreover, the billing records that Baker cites do not support the inferences that Baker draws. Baker relies on the entries for March 31 and April 7: "Review final changes to release" and "Review and approve last changes to release." These entries, according to Baker, indicate that additional changes were made to the Settlement after Giles received it from Baker's attorney.

The timing of relevant events, however, does not support Baker's argument. Giles received the Settlement on March 30, 2000. One day later, Giles and Stevens signed it. Giles's statement that he "[r]eview[ed]" the final changes on March 31 thus reflects nothing more than Giles discussing the March 30 draft with his client before he and Stevens both signed the draft. The entry does not indicate that any new or additional changes were made.

One week then passed before Giles faxed the signed copy of the Settlement to Baker. During this time, there are no entries in Giles's records showing that Giles was communicating with opposing counsel or actively altering the Settlement. Giles's entry for April 7 thus does not refer to any new or additional changes to the Settlement as received from Baker on March 30, 2000. Instead, the entry indicates only that Giles reviewed the changes that had previously been made one last time before his client accepted Baker's offer by returning the signed copy of the March 30 final draft. Giles's records, in other words, simply reflect his caution in reviewing and approving the March 30 final draft before he committed himself and his client to its terms.

Indeed, if Giles had been actively adding or negotiating new terms, the record indicates that he would have written as much. Giles's entries in December 1999 and January 2000 include the following: (1) "Work on settling case. . . . relay same to client and discuss same," (2) "Teleconference with Steve [Broussard] re client's counter offer. Discuss same," and (3) "Talk to defense re their counter offer." These records show that, when Giles *was* actively involved in settlement negotiations, he recorded his communications about those negotiations. That Giles did *not* record any such communications in the period from March 30 to April 7 of 2000 thus supports the conclusion that there were no continuing negotiations or other changes to the Settlement during that time. As a result, Giles's references to the "changes" in his March 31 and April 7 billing entries can best be interpreted as referring only to his review of changes that were previously made. The entries do not indicate that Giles changed the terms of the March 30 draft before he accepted those terms by faxing the signed copy of the Settlement to Baker.

In addition, even if Giles had made subsequent changes to the Settlement, the changes would have been immaterial. This is because, as noted above, a response to an offer that contains different or additional terms functions as a counteroffer that the original offeror may either accept or reject. *Midwest Eng'g & Constr. Co. v. Elec. Regulator Corp.*, 435 P.2d 89, 96 (Okla. 1967). Thus, even if the draft of the Settlement that Giles faxed to Baker on April 7, 2000 contained new or additional terms as compared to the draft of the Settlement that Giles received on March 30, 2000, the later draft functioned as a counteroffer. *See id.* Baker then accepted that counteroffer by performing according to the terms of the contract, with the result that the April 7, 2000 draft of the Settlement became a binding contract between Baker and Stevens. That draft,

moreover, undisputedly includes the Release Provision, so even if we accept Baker's contention that Giles's records reflect continued settlement negotiations, Baker is still bound by the Release Provision. The district court therefore did not err in granting summary judgment on the ground that Baker had released Stevens from his confidentiality obligations.

### b. *Records from December and January*

Baker next cites Giles's billing records from December 1999 and January 2000:

| 12/24/99 | Legal Work. Work on settling case. Defendant offered $8,500.00. relay same to client and discuss same. | 0.25 125.00/hr |
| --- | --- | --- |
| 12/30/99 | Teleconference – Billable. Teleconference with Steve brousard [sic] re client's counter offer. Discuss same. Relay update to client. | 0.25 125.00/hr |
| 01/12/00 | Talk to defense re their counter offer. $10,000. Relay to client for consideration. | 0.50 125.00/hr |
| 01/17/00 | Teleconference – Billable. Teleconference with Mr. Brousard [sic].   Counter $10,000 and fees of $1,500. Mr. Brousard [sic] checked and counter was rejected. Relay same to client. | 0.25 125.00/hr |
| 01/20/00 | Legal Work. Notify Court of Settlement. | 0.25 125.00/hr |

These records indicate that the parties were negotiating a settlement of the Oklahoma lawsuit as early as December 1999. Baker then notes that the entry for January 20, 2000 reads "Notify Court of Settlement." This entry, according to Baker, establishes that the Oklahoma lawsuit was settled as of that date. In addition, Baker observes that Giles's records from this time period do not reflect any discussions about a release of claims or obligations. Baker thus contends that the parties settled the Oklahoma lawsuit in January 2000 and did so without any release of Stevens from his confidentiality obligations.

This argument suffers from two flaws. First, Baker raised this argument only in its reply brief. The argument is accordingly waived. *See United States v. Abboud*, 438 F.3d 554, 589 (6th Cir. 2006) ("An argument first presented to the Court in a reply brief is waived."); *Wright v. Holbrook*, 794 F.2d 1152, 1157 (6th Cir. 1986) ("Since defendant was deprived of an opportunity to address the issue by plaintiff's failure to raise this issue in his original brief, we will consider the issue waived.").

Second, Baker's argument fails on the merits. Even if the parties had reached an oral agreement or a settlement in principle in January 2000, Giles's later records—the same records that Baker itself cites in its opening brief—unambiguously indicate that the parties continued to refine the terms of their agreement in February and March of 2000. And those records, as analyzed above, show that the parties did not finalize their agreement (by Stevens dismissing his lawsuit after receiving payment from Baker) until the Settlement was circulated. This pattern of notifying the court of a tentative settlement, to be followed by putting the agreement in writing, is actually quite the norm.

In addition, Oklahoma law expressly provides that the parties to a contract may subsequently alter its terms. Okla. Stat. tit. 15, §§ 236-37. Thus, even if Baker and Stevens originally settled the case without including the Release Provision, that original agreement does not preclude the parties' later consent to the terms of the Settlement.

**C.      The district court did not commit reversible error in declining to strike Giles's declaration and billing records**

We next turn to Baker's arguments based on the Federal Rules of Civil Procedure. Summary judgment in this case was based in part on Giles's billing records and on a declaration in which Giles described the course of settlement negotiations between Baker and Stevens. Baker argues that the district court should have excluded these documents under Rule 26(a)(1) and (e), Rule 37(c)(1), and Rule 56(c)(4) of the Federal Rules of Civil Procedure.

*1.  Rule 26(a)(1) and (e) and Rule 37(c)(1)*

Rule 26(a)(1) requires parties to disclose information regarding "each individual likely to have discoverable information . . . that the disclosing party may use to support its claims or

defenses." Fed. R. Civ. P. 26(a)(1)(A)(i). In addition, Rule 26(e) requires a party to supplement its disclosures "if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A). A party failing to comply with these rules "is not allowed to use" the information or person that was not disclosed "on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

Baker asserts—and Defendants concede—that Giles and his records were not included in Defendants' initial disclosures under Rule 26(a)(1). As a result, Baker contends that Giles and his records should have been excluded from the district court's consideration under Rule 37(c)(1).

In most cases, Baker's argument would carry significant weight. *See Sexton v. Uniroyal Chem. Co.*, 62 F. App'x 615, 616 n.1 (6th Cir. 2003) ("Rule 37 is written in mandatory terms and is designed to provide a strong inducement for disclosure of Rule 26(a) material." (citation and internal quotation marks omitted)). The particular facts of the current case, however, make Baker's argument unconvincing.

To start with, Defendants' counsel explain that they did not learn of Giles's relevance to the case at hand until they received a draft of the Settlement (from Baker itself) on February 27, 2015, more than one month after the January 14, 2015 date on which the parties' disclosures under Rule 26(a)(1) were due. Their failure to list Giles at the time of the original disclosures is thus fully understandable.

Baker next argues that, even if Defendants had a justifiable reason not to identify Giles in their initial disclosures, Defendants nonetheless should have supplemented their initial disclosures in accordance with Rule 26(e). Their neglecting to do so, according to Baker, should have resulted in the exclusion of Giles's declaration and records under Rule 37.

Baker's argument is unavailing because the specific facts of this case demonstrate that Defendants did in fact comply with Rule 26(e). That Rule, as noted above, requires a party to supplement its initial disclosures only if the new information "has not otherwise been made

known to the other parties during the discovery process." Fed. R. Civ. P. 26(e)(1)(A). Here, Giles and the information about his role in the settlement negotiations had in fact "otherwise been made known" to Baker. First, Baker itself produced the Settlement document that first alerted Defendants' counsel to Giles's relevance to the present lawsuit. Baker thus had access to the very document indicating that Giles played a key role in negotiating the Settlement. Second, Defendants asserted in their answer to Baker's second amended complaint that the Settlement barred Baker's claims. They also included as an exhibit the Settlement document signed by Stevens and Giles. Finally, both Giles himself and the negotiations surrounding the Settlement were discussed during a deposition of Baker's in-house counsel that took place well before the discovery deadline.

The discovery process in this case consequently revealed that (1) Giles was a central figure in the settlement negotiations between Baker and Stevens, and (2) Giles would clearly have information relevant to the parties' claims or defenses. Giles and his role in this case were accordingly "otherwise . . . made known to [Baker]," so Defendants did not violate either Rule 26(a)(1) or Rule 26(e).

Baker counters that the disclosure of Giles was insufficient because Defendants allegedly did not provide an explicit statement that they intended to rely on Giles and his records in moving for summary judgment. But Baker cites no binding authority for the proposition that Rule 26(e) requires such an explicit statement and, in any event, this alleged deficiency would not change our disposition of this issue. This is because Rule 37(c)(1) calls for the exclusion of a witness as a sanction for violating Rule 26(e) only if the violation was not "substantially justified or . . . harmless." Fed. R. Civ. P. 37(c)(1).

For the reasons previously discussed, Baker was plainly aware of Giles's role in the negotiations resulting in execution of the Settlement. Moreover, Defendants' assertion of the Settlement as an affirmative defense and the deposition of Baker's in-house counsel occurred well before the July 30, 2015 close of discovery. Baker thus had both (1) knowledge of Giles and his role in this litigation, and (2) ample time to depose Giles or otherwise seek discovery with respect to Giles and his records. Any failure of Defendants to comply with Rule 26 was therefore a "harmless" violation that did not require the district court to exclude the Giles-related

documents.  *See* Fed. R. Civ. P. 37(c)(1); *see also Howe v. City of Akron*, 801 F.3d 718, 747 (6th Cir. 2015) (noting that a violation of Rule 26 is likely to be harmless when the opposing party already has "sufficient knowledge" of the undisclosed information).

### 2.  *Rule 56(c)(4)*

Baker next argues that the district court should have excluded Giles's declaration under Rule 56(c)(4) of the Federal Rules of Civil Procedure.  That rule provides that a "declaration used to support or oppose a motion must be made on personal knowledge" and "set out facts that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(4).  Giles's declaration purportedly did not satisfy this rule because it contained speculation and legal conclusions that went beyond anything that Giles "could actually know."   Baker identifies four allegedly objectionable statements:

(1)      As consideration for the execution of the Final Agreement and dismissal of the Case, Baker agreed to pay to Bruce Stevens the Sum of Ten Thousand Dollars ($10,000).

(2)      The Final Agreement was entered into as of March 31, 2000.

(3)      The Final Agreement that my office received from Broussard on or around March 30, 2000 was an offer . . . .

(4)      Stevens and Baker both performed pursuant to the terms of the Final Agreement.

Baker contends that the first statement is "pure speculation as to why Baker Hughes might have paid Stevens."  But the Settlement itself provides that, "[i]n consideration for the execution of this Release, Baker agrees to pay to Stevens the sum of Ten Thousand Dollars ($10,000)."  Thus, even assuming that Giles's first statement is inadmissible speculation, the statement has no bearing on the outcome of this case because the documentary evidence in the record already reflects the substance of the statement.

Baker next argues that the second statement is a "legal conclusion regarding if and when a contract was formed."  The Settlement, however, is dated March 31, 2000, and the parties' conduct, as described above, did in fact result in the formation of a contract.  Again, then, other evidence in the record is consistent with Giles's statement, such that the statement itself is unnecessary to resolve any issues in this case.

Baker then contends that Giles's third statement is "pure speculation" about what Baker intended to accomplish by sending the Settlement. As explained above, however, *see* Part II.B.2. above, the language of the document and Baker's action in sending it establish that the document was an offer. Giles's statement on this issue is thus irrelevant.

Finally, Baker maintains that the fourth statement is also "pure speculation" about why the parties acted the way they did. The Settlement, however, plainly calls for Baker to pay Stevens $10,000 and for Stevens to dismiss the lawsuit. Both parties undisputedly fulfilled these obligations, so the only reasonable inference is that the parties performed the terms of the Settlement. As a result, Giles's fourth statement is irrelevant.

For these reasons, the district court's consideration of Giles's affidavit was not necessary to the court's decision to grant summary judgment in favor of Defendants. Any error in that consideration accordingly does not require reversal. *See* Fed. R. Civ. P. 61 ("At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights."); *see also Brainard v. Am. Skandia Life Assurance Corp.*, 432 F.3d 655, 667 (6th Cir. 2005) (applying harmless-error analysis to an alleged violation of Rule 56(c)(4)'s predecessor).

**D.     The district court did not err in refusing to consider the parties' post-settlement conduct when interpreting the Settlement**

Baker finally contends that the district court should have considered the interactions between Baker and Stevens in the years following the execution of the Settlement. It observes that, as noted above, it accused Stevens in 2002 of breaching his confidentiality obligations. In addition, Baker explains that it reminded Stevens of his confidentiality obligations in 2008 and 2013. Stevens did not assert in response to any of these accusations or reminders that he had been released from his obligations by the terms of the Settlement. Baker thus argues that Stevens's conduct amounts to a tacit admission that the parties did not consent to the Release Provision.

In response, Stevens points out that the interpretation of a contract under Oklahoma law depends primarily on the language of the contract itself. When that language is unambiguous,

extrinsic evidence such as the parties' course of conduct may not be used determine the contract's meaning.  *Pitco Prod. Co. v. Chaparral Energy, Inc.*, 63 P.3d 541, 546 (Okla. 2003) ("If a contract is complete in itself, and when viewed as a totality, is unambiguous, its language is the only legitimate evidence of what the parties intended.").  If, in contrast, the language of the contract is ambiguous, then a court may use extrinsic evidence to interpret that language.  *State ex rel. Comm'rs of Land Office v. Butler*, 753 P.2d 1334, 1343 n.23 (Okla. 1987) ("Extrinsic evidence to be used in search of the instrument's intended meaning is admissible *only* when the language used is susceptible of multiple meanings and there is a dispute between the parties as to the intended meaning of the language in controversy." (emphasis in original)).

In the present case, the Release Provision of the Settlement is plainly broad enough to encompass the confidentiality obligations imposed by Stevens's Termination Agreement with Baker.  As a result, the district court correctly concluded that the release was not ambiguous and that the parties' course of conduct was accordingly irrelevant to its interpretation of the effect of the release.

Baker argues that this analysis is incorrect.  It maintains that the proper question is not whether the Release Provision is ambiguous, but whether the parties agreed to enter into a contract that contained the Release Provision at all.  Baker, in other words, acknowledges that it settled the Oklahoma lawsuit, but maintains that the terms of that agreement were different than those set out in the Settlement.  And because Stevens never asserted in 2002, 2008, or 2013 that he had been released from his obligations, the actual terms of their agreement—according to Baker—must not have included any release.

This argument is unavailing.  For the reasons previously explained, the Settlement became a binding contract between Baker and Stevens when the two parties consented to its terms through the process of offer, acceptance, and performance.  *See* Part II.B.2. above.  The Release Provision is therefore binding on the parties, and Stevens's subsequent conduct does not change the meaning of that provision.  *See Pitco*, 63 P.3d at 546 ("If a contract . . . is unambiguous, its language is the only legitimate evidence of what the parties intended.").

## III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.